[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] On September 1, 2005 we sua sponte consolidated cases 05CA24 and 05CA25 for purposes of appeal. We now include case number 05CA23 for purposes of our review, decision and judgment.
 DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from an Athens County Common Pleas Court, Juvenile Division, judgment that awarded Athens County Children Services (ACCS) permanent custody of Austin Link, born September 14, 1998, and Melvin "Eddie" Link, born June 26, 2000.
 {¶ 2} In Case Number 05CA23, appellant Adam Link, the children's natural father, raises the following assignments of error for review and determination:
FIRST ASSIGNMENT OF ERROR:
"THERE WAS NOT CLEAR AND CONVINCING EVIDENCE FOR THE COURT TO FIND THAT THE CHILDREN COULD NOT BE PLACED WITH EITHER PARENT PURSUANT TO OHIO REVISED CODE SECTION 2151.414(E)."
SECOND ASSIGNMENT OF ERROR:
"ATHENS COUNTY CHILDREN SERVICES DID NOT MAKE REASONABLE EFFORTS TO MAKE IT POSSIBLE FOR THE CHILDREN TO RETURN SAFELY TO THE HOME AS REQUIRED BY OHIO REVISED CODE SECTION 2151.419(A)."
 {¶ 3} In Case Numbers 05CA24 and 05CA25, appellant Crystal Link, the children's natural mother, raises the following assignments of error for review and determination:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT DENIED CRYSTAL LINK HER SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION RIGHTS PURSUANT TO BOTH FEDERAL AND STATE CONSTITUTIONS WHEN IT PREDICATED ITS DECISION TO TERMINATE HER PARENTAL RIGHTS ON HER POVERTY."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN VIOLATION OF HER SUBSTANTIVE RIGHT TO DUE PROCESS UNDER THE OHIO AND FEDERAL CONSTITUTIONS WHEN IT ADMITTED HER PSYCHOLOGICAL REPORT INTO EVIDENCE OVER OBJECTION OF COUNSEL."
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN ADMITTING THE PSYCHOLOGICAL REPORT ON CRYSTAL LINK BECAUSE IT WAS HEARSAY."
FOURTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT'S FINDING THAT CRYSTAL'S ALLEGED `CHRONIC AND SEVERE MENTAL AND EMOTIONAL ILLNESS SUBSTANCE ABUSE' SUPPORTS A GRANT OF PERMANENT CUSTODY TO THE AGENCY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE."
 {¶ 4} Beginning in 2002, the children were removed from the parents' custody four separate times in order to allow the parents to address domestic violence issues and to provide a safe home for the children. Beginning in May of 2002, the children lived with their paternal grandparents. At some point they returned to their parents' home, but once again lived with their grandparents beginning in November of 2002. This placement resulted from a Meigs County Children Services' investigation of abuse allegations. The children stayed with their grandparents until June of 2003.
 {¶ 5} In November of 2003, the general division in a domestic relations action granted temporary custody of the parties' children to their paternal aunt, Lillian Brown. On March 10, 2004, Brown advised ACCS that she was not able to care for the children. Thus, on March 11, 2004, ACCS filed a complaint and alleged that the children are abused, neglected, and dependent and requested custody. The trial court granted ACCS emergency custody of the children. The children have remained in ACCS's temporary custody since March 2004.
 {¶ 6} On April 7, 2004, the trial court adjudicated the children dependent and dismissed the abuse and neglect allegations. On February 28, 2005, ACCS filed a motion requesting a permanent custody award.
 {¶ 7} The guardian ad litem recommended that the trial court grant ACCS permanent custody. In her April 19, 2005 report, she stated:
"The history of this family includes violence, abuse, and neglect which have affected the children since Austin was only two months old. Use of alcohol and marijuana appear to have been part of the problem within this family. Four times the children have been removed from the parents to provide them a safe haven while the parents were to put their own lives in order so they could provide a safe, nurturing home and appropriate parenting to their children.
The children were removed temporarily in 2002 and placed with Pat and Richard Link for a brief time.
In December 2002, they were again placed in the custody of the Links for six months ending in June 2003.
The family was together as a unit for only a few weeks during all of 2003 as the parents separated in July and the boys remained with their father until late November of that year when they were placed in the temporary custody of Lil and Ed Brown so that the parents had the opportunity to complete orders from the Domestic Relations Court in order to regain custody of the children.
By March 2004, the Browns could no longer maintain the boys in their household and temporary custody was given to ACCS. Again, the parents were ordered to complete the original orders from the Domestic Relations Court and a case plan was developed to help them help themselves with the goal of eventual reunification with their children.
In reality, this family has not lived as a family in more than two calendar years other than a brief period in June 2002.
It appears that the only time the parents have attempted to comply with court orders and the opportunities to help themselves has been since January 2004, but those efforts have been inconsistent and not entirely effective."
 {¶ 8} The guardian ad litem concluded "[t]here is no clear indication that either parent has developed sufficient skills or insight into the needs of their children to be able to parent them successfully now or any time in the immediate future.
 {¶ 9} At the permanent custody hearing, Mr. Link testified that at the time of the hearing he had been living in a three bedroom home for just over a year. He admitted that he is not currently employed, but has been enrolled in the "job-seek program" for about a month and one-half. Mr. Link stated that in November 2003, the domestic relations court ordered him to participate in the program and that he did not enroll until approximately a year and one-half later. He was last employed in 2003.
 {¶ 10} Mr. Link admitted that he and Mrs. Link had domestic violence issues in the past. "[A] couple of times," in front of the children, he choked the mother until she passed out and lost control of her bodily functions. Mr. Link stated that he abused alcohol and marijuana and that Mrs. Link sometimes gave the children beer. He also stated that he suffers from depression and a sleep disorder.
 {¶ 11} Mr. Link testified that in December of 2002, he and Mrs. Link agreed to place the children to his parents. In June of 2003, the children returned. In November of 2003, Mr. Link's sister was given custody of the children and they stayed with her until March of 2004.
 {¶ 12} Crystal Link testified that Mr. Link allowed Austin to puff on a marijuana cigarette "like it was a straw." She stated that one time when Austin was in diapers, Mr. Link kicked Austin in his private area. She explained that Austin accidentally hit his father in that area while playing and Mr. Link struck back. She also testified that she had concerns that Austin was sexually abused.
 {¶ 13} Edward Brown, the children's paternal uncle, testified that Mr. and Mrs. Link do not know how to be parents and that if the court returns the children to the parents then "you're fools." He stated that Mr. and Mrs. Link "should never have children." Brown stated that Mr. Link has smoked marijuana and drunk alcohol with Austin when Austin was about three or four years old and called Austin his "drinking buddy." Brown testified that Mr. Link told him that the parents sometimes put beer in Austin's bottle to make him sleep at night. He does not believe that Mr. Link is a good father.
 {¶ 14} Megan Zimmerman, Mr. Link's former girlfriend and the mother of two of his children, testified that Mr. Link has not paid child support and has not seen his children in three years. She stated that one time when she saw Mr. Link's boys, Austin and Eddie, Austin took his clothes off to go swimming and she noticed bruises on his body. She also noticed that his underwear was so dirty that it was black.
 {¶ 15} Lillian Brown, the children's paternal aunt, testified that she has witnessed Mr. Link physically abuse the boys. Mrs. Link told her that Mr. Link put beer in the baby bottles to make the children sleep at night. Brown stated that the children were not well-groomed and that they smelled because they did not have baths or clean clothes. She stated that the children are allergic to cigarette smoke, but the parents continue to smoke around the children. Brown stated that when they were at her house, the children hid food to save for later because they said that their father did not feed them and they wanted to make sure they would have food. Mrs. Link told her that she does not feel capable of caring for the boys because of her "mental immaturity." Mrs. Brown stated that Eddie told her that he did not want to go home to his parents, but wanted to live with her.
 {¶ 16} Mrs. Brown testified that Austin had some sexual acting out at school and that he stated his father sexually abused him. She explained that one day, Austin began fidgeting with his private area. She asked him if he had to go to the bathroom. He said "no I'm just doing what my daddy does to me." He then showed her what his father does. He took off his pajamas in the bathroom "and Austin bent himself over the toilet and then without saying anything he grabbed his butt cheeks[,] pulled his butt cheeks apart and with one finger while he was holding his butt cheeks he went like this to his * * * butt hole and then just as quick as he done that he stands up and he turns his self [sic] over the toilet backwards like this he grabs his pee-pee with this hand and starts [masturbating]. Then with this hand he grabs his sac and he starts tickling it and laughing. And I said, Austin what are you doing now and he said, that's what daddy did."
 {¶ 17} Mrs. Brown also discussed an incident when she observed Mr. Link with his daughter, Lilly, from his relationship with Zimmerman. She went to Mr. Link's house and when he answered the door, he was in a towel around his waist and Lilly was on the couch with a towel around her. She was squatting on the couch and had her legs spread apart and was touching her private area. She yelled at Mr. Link and told him he should not be showering with Lilly. He said that he had not done anything wrong.
 {¶ 18} Meigs County Department of Jobs and Family Services Social Service Worker Charles Knopp testified that he first became familiar with the Link family in 2000. While at the home, he noticed that Austin had a red slap mark on the side of his face. Initially, both parents denied knowledge of how it happened, but Mr. Link subsequently admitted that he caused it. Mr. Link was arrested and the agency took Mrs. Link and the children to the agency. She and the children later went to a domestic violence shelter. Mr. and Mrs. Link subsequently agreed to give the children to Mr. Link's parents for six months.
 {¶ 19} Tri-County Mental Health and Counseling (TCMH) therapist Erin Lucas testified that she was Austin's and Eddie's therapist. She stated that Austin has reactive attachment disorder, post-traumatic stress disorder, bipolar disorder, and attention deficit hyperactivity disorder. Lucas stated that Austin once wet his pants before a visit because he stated he was afraid. She testified that Austin has stated the he does not want to live with his mother because "she don't got games." He stated that he would like to live with his father "because he has video games but he might be mean when someone is not watching him anymore."
 {¶ 20} Lucas described the ideal family for Austin's problems: (1) the family needs to display the willingness to assist in processing his abuse, neglect, and trauma of domestic violence and their effect on his life; (2) the family must have the time and commitment to participate in attachment therapy; (3) the family must have "[a]n understanding of attachment issues and their effect on family structure. Flexibility and willingness to learn alternate and new parenting techniques"; and (4) he needs a nurturing home to encourage growth, development and trust. Lucas further stated that Austin needs plenty of special time and attention and that he acts best when he is with an adult at all times. Lucas explained that Austin "disregulates, demonstrated by hurting others or himself, when left alone." She testified that Austin needs a blend of nurturing and discipline and a family with a sense of humor and a high level of supervision for younger children and animals. Lucas stated that the family must have an understanding of developmental processes and a clear, consistent structure.
 {¶ 21} Patricia Link, Mr. Link's adoptive mother, testified that she does not think the children should live with Mrs. Link and she is reluctant to say that Mr. Link should have either child. She would recommend that children services receive permanent custody of the children.
 {¶ 22} ACCS social worker Nikki Peyton testified that she does not believe the children's needs would be met if they were returned home. She stated that ACCS used reasonable efforts by providing case management, treatment team meetings, substitute care, and transportation.
 {¶ 23} On June 22, 2005, the trial court determined that the children's best interests would be served by a permanent custody award to ACCS. In examining the best interest factors, the court stated:
"The Link children are currently cared for in separate foster homes. There is a history of difficulty between the two children as well as difficulty in the care of virtually everybody who has worked with them. The children's relationships with their mother and father are scarred by the history of abuse and neglect in the marital home and elsewhere. Several different family members have provided care for the children from time to time. Each child is doing well in his respective foster home under the care, guidance, and consistent supervision of the foster families. The boys have no meaningful relationship with their half siblings.
* * *
At various times in this case the children have expressed certain wishes regarding their placement and the outcome of the case. The in camera interview provided little valuable information to the Court. Austin Link has most consistently expressed a desire to live with his father. However, his explanation for that desire is directly related to a family pet and an opportunity to play Nintendo or Playstation at father's apartment. He has not express[ed] any desire to be reunited with his mother in any recent communications. Melvin `Eddie' Link has never clearly expressed his wishes in any meaningful fashion. Both children lack sufficient maturity to protect their best interests in this regard.
* * *
The children have lived with their parents since birth with certain notable exceptions. In approximately May of 2002, both children went to live with their paternal grandparents in Franklin County, Ohio, for some time. Again, in November of 2002, the children were placed with their paternal grandparents in Franklin County, in part as a result of Meigs County Children Services' investigation of abuse allegations. That placement lasted until June of 2003, when the children returned to their parents. In November of 203, the children were placed with their aunt and uncle, Lillian and Edward Brown, in Athens County as a temporary arrangement during the beginning of divorce proceedings between Mr. and Mrs. Link. In March of 2004, Mr. and Mrs. Brown asked [ACCS] to take the children's custody as issues had become too complicated for them to manage. Since March of 2004, the children have been in foster care in the temporary custody of ACCS.
* * *
The children are clearly in need of a legally secure placement that can only be provided with a grant of permanent custody to ACCS. Neither parent has the skills or commitment to properly care for these children. While there are certain family members who continue to express some interest in helping raise the children, their interest is conditional and typically involves the requirement that there be no interference from one or both of the biological parents."
 {¶ 24} The court concluded that the children cannot be placed with either parent within a reasonable time and should not be placed with either parent. The court stated that the parents have continuously and repeatedly failed to substantially remedy the conditions causing the children's removal. The court noted that most of the testimony related to the parents' long history of unacceptable parenting. The court additionally observed that the guardian ad litem "has consistently and regularly sounded the alarm regarding the parents' lack of commitment to proper parenting. Various substitute care providers, including relatives, have expressed their own deep concerns about the ability of either party to adequately parent these children."
 {¶ 25} The court examined each parent's situation and stated:
"Adam Link is not currently employed. He was employed on a part time basis during a portion of this case history, but he has openly expressed his belief that he will not be able to maintain employment. One of the telling statements he made in his testimony came when he was asked about the ability to provide income. After indicating that he had applied for social security disability and been denied, he said `I'm fighting social security.
That's what I've been doing for the last year and a half.' Mr. Link describes himself as being medication-dependent, having depression, a sleep disorder, and frequent migraine headaches. He was ordered to participate in a seek work (job search) program a year and a half ago and only signed up a month before the hearing began on the motion for permanent custody. He has stable housing in a subsidized apartment where his rent, which includes all utilities, is only $12.00 per month. Mr. Link is the biological father of two other children from a prior relationship and has failed to pay court ordered support for those children.
Mr. Link has a long history of alcohol and drug abuse as well as domestic violence. It is undisputed that multiple incident[s] of domestic violence between Mr. and Mrs. Link have occurred in the presence of the children.
There is also clear and convincing evidence that Mr. Link has perpetrated physical abuse on his children. Regarding the history of his drug and alcohol abuse, Mr. Link acknowledges that while living with his wife and children, he and Mrs. Link would consume one or two cases of beer and a fifth of liquor in a day.
Also, when it was available, they would consume marijuana in whatever amount they happened to have. The children were openly exposed to these behaviors on a regular basis.
Mr. Link acknowledges letting his rage get the better of him on occasions. He acknowledges slapping the children on their faces and choking Crystal Link to the point of unconsciousness. Mr. Link remains without a valid driver's license.
At the time of the hearing, Crystal Link was living at a local motel on a day-to-day basis.
Before that she was living with a paramour who engaged in two incidents of domestic violence toward her in a relatively short period of time. When she lived with Mr. Link, she claims that she drank less alcohol than [he] but smoked `about half of whatever marijuana was around.' Her latest boyfriend is also a marijuana smoker. Crystal Link currently works twenty hours per week at the local Salvation Army and is paid at the rate of $6.50 per hour. She reports that Mr. Link choked her to the point of unconsciousness `more than twenty times.' She also personally observed Mr. Link kick their son Austin in the private parts twice while he was still in diapers. She also testified about other abusive behaviors on the part of Mr. Link. Mrs. Link does have a driver's license, but she has no vehicle and no independent insurance. It would be impossible for her to support housing, transportation, and related necessities on her income even if she worked forty hours a week."
 {¶ 26} The court also relied upon Lillian Brown's testimony in deciding to award ACCS permanent custody:
"Adam Link's sister Lillian Brown * * * observed much abuse of Austin by Adam Link. She observed the use and abuse of liquor, beer and marijuana by Adam and found the children's hygiene and appearance to be very poor. She described both children as hiding and hoarding food and toys when they first came to live with her. She also described at length the very bad relationship between the two boys. She further testified that Crystal Link had openly acknowledged her inability to parent these children."
 {¶ 27} The court additionally referred to Lucas' testimony:
"The Court received testimony from Erin Lucas, a licensed social worker at [TCMH]. In her testimony she indicated that Austin Link has diagnoses of reactive attachment disorder; post traumatic stress disorder; bipolar disorder; and attention deficit hyper activity disorder. She described Austin's various reports of the abuse he has suffered at the hands of the father and the acquiescence of the mother. Austin described being thrown against the wall, being hit and kicked and touched all over his body and having dad hurt his `balls and butt.' Austin had the insight to say to her that dad might `be mean' if nobody is watching him anymore. She also opined that Austin was not developmentally ready to make choices about where and with whom he should live. She also, unfortunately, testified that it would [be] very difficult to place these brothers together. In a full year of counseling with Austin, the progress has been very limited. By contrast, [Eddie} is not currently receiving counseling or medication. In spite of numerous and repeated interventions of counseling and related social services, neither parent has demonstrated insightful changes in their behaviors or a true commitment to improve their choices and environment."
 {¶ 28} The court next examined R.C. 2151.414(E)(2) and stated:
"Regarding R.C. 2151.414(E)(2) both parents carry Axis I diagnoses in addition to their history of substance abuse. Crystal carries the following diagnoses: Axis I, adjustment disorder with depressed mood; learning disorder — not otherwise specified; social phobia (social anxiety disorder): Axis II; personality order not otherwise specified with anti-social personality features. Adam Link is diagnosed as follows. Axis I; adjustment disorder with depression and anxiety: Axis II; borderline personality disorder. Each parent has a history of mental and emotional illness as well as substance abuse. These conditions are chronic and severe making these parents presently unable to provide an adequate, permanent home for their children. For years, counseling has been used to address these situations. There is no reason to believe that another year, or any period of time, is going to allow either parent to meet the minium requirements for providing a safe, permanent, stable, and consistent home life for their children."
 {¶ 29} The court further found that ACCS used reasonable efforts:
"ACCS provided a variety of service referrals, transportation assistance, financial aid, parent education, substitute care, visitation in multipl[e] settings, and general case management." The court determined that the "efforts did not prevent or eliminate the need for removal because neither parent was able to sustain a commitment to change and improvement that was acceptable in light of the needs of these children. It is important to remember that since November of 2002, these children have lived with their parents less the six months! The `removal' in this case was from the aunt and uncle who already had the children through a domestic relations court order."
 {¶ 30} Both parties filed timely notices of appeal.
 I {¶ 31} Because both the mother's and the father's appeal rests upon some basic principles governing permanent institutional custody cases, we first set forth the principles that govern our resolution of both appeals.
 A STANDARD OF REVIEW {¶ 32} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; see, also, Wardeh v. Altabchi, 158 Ohio App.3d 325,2004-Ohio-4423, 815 N.E.2d 712. A reviewing court affords every reasonable presumption in favor of the trial court's judgment and findings of fact, and evidence susceptible of more than one interpretation is construed consistently with the trial court's judgment. Wardeh v. Altabchi, 158 Ohio App.3d 325,2004-Ohio-4423, 815 N.E.2d 712 (citing Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533).
 {¶ 33} We note that our role as a reviewing court does not permit us to re-weigh the evidence or to assess the credibility of witnesses. Rather, as stated in State v. Awan (1986),22 Ohio St.3d 120, 123, 489 N.E.2d 277, 280, appellate courts must defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor: "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact." SeeIn re Harmon (Sept. 25, 2000), 00CA2693.
 B STANDARD GOVERNING PERMANENT CUSTODY DECISIONS {¶ 34} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children.Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599; In re Murray (1990), 52 Ohio St.3d 155, 156,556 N.E.2d 1169. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In reCunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034
(quoting In re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands it.
 {¶ 35} R.C. 2151.413 permits a public children services agency that has temporary custody of a child to file a motion requesting permanent custody of the child. In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
 {¶ 36} R.C. 2151.414(A)(1) requires a trial court to hold a hearing regarding the motion for permanent custody. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1).
 {¶ 37} When considering a request for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
To provide for the care, protection, and mental and physical development of children * * *;
* *
To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01.
 {¶ 38} We note that clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
"The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23; see, also, State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54. In reviewing whether a trial court's decision is based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74,564 N.E.2d 54. If a trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
 {¶ 39} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273:
 {¶ 40} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 41} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 42} R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":
(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
(3) The parent committed any abuse as described in section2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
(6) The parent has been convicted of or pleaded guilty to [certain criminal offenses] and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
(7) The parent has been convicted of or pleaded guilty to [certain criminal offenses];
(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or2151.415 of the Revised Code with respect to a sibling of the child.
(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
(15) The parent has committed abuse as described in section2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
 {¶ 43} A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the above factors. We note that the existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In re William S. (1996),75 Ohio St.3d 95, 661 N.E.2d 738; In re Hurlow (Sept. 21, 1998), Gallia App. No. 98 CA 6; In re Butcher (Apr. 10, 1991), Athens App. No. 1470.
 {¶ 44} R.C. 2151.414(D) requires a trial court to consider specific factors in determining whether a child's best interests would be served by granting a motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C.2151.414(E)(7) to (11) apply.
 II Case No. 05CA23 A {¶ 45} In his first assignment of error, the father argues that the trial court wrongly concluded that the children could not be placed with either parent within a reasonable time. He claims that the court ignored evidence regarding the parents' use of "medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." The father asserts that the court's finding that any length of time will not allow either parent to meet the minimum requirements for providing a safe, permanent, stable, and consistent home life for the children is against the manifest weight of the evidence. He also claims that he does not have a chronic mental, emotional illness or chemical dependency that is so severe that he will be unable to provide an adequate permanent home for the children within one year.
 {¶ 46} In the case sub judice, we believe that the trial court cited ample evidence[2] to support its finding that the children cannot or should not be placed with either parent within a reasonable time and the record supports its finding. The parents have unsuccessfully tried to maintain custody of their children since 2002. While they had some success in complying with the case plan and completed some counseling, they have not demonstrated a suitable commitment to provide a safe, stable, nurturing home for the children. The evidence shows that despite his compliance with certain case plan goals, the father remains unable to provide the type of home that his children need. Given the father's extensive history of marijuana and alcohol abuse and his inability to maintain a consistently safe and nurturing home for the children throughout his involvement with the various children services agencies, the trial court's finding that the children cannot and should not be returned to him is not against the manifest weight of the evidence.
 {¶ 47} The father additionally asserts that the court's R.C.2151.414(E)(2) finding is against the manifest weight of the evidence. He contends that the evidence fails to show that he has a chronic and severe mental or emotional illness or substance abuse. Assuming, arguendo, that the court's finding is not supported by the manifest weight of the evidence, we believe that in light of the evidence adduced at trial, any error constitutes harmless error. While the court referred to R.C. 2151.414(E)(2) in finding that the children cannot or should not be returned to either parent, it also relied upon R.C. 2151.414(E)(1) to make this finding. That section does not require a finding regarding chronic or severe mental illness or substance abuse. Therefore, even if we assume the father's argument to be correct, the error is harmless because ample evidence exists regarding the R.C.2151.414(E)(1) factor.
 {¶ 48} Accordingly, based upon the foregoing reasons, we overrule the father's first assignment of error.
 B {¶ 49} In his second assignment of error, the father contends that the trial court erred by awarding ACCS permanent custody when ACCS failed to use reasonable efforts.
 {¶ 50} Children services agencies are statutorily required to develop case plans for children in their custody and the case plans should include objectives for each of the child's parents. See R.C. 2151.412. Trial courts must determine whether an agency made reasonable efforts to return the child to the parents before it authorizes the removal of the child. See R.C. 2151.419;In re Leitwein, Hocking App. No. 03CA18, 2004-Ohio-1296; In reWright, Ross App. No. 01CA2627, 2002-Ohio-410. In determining whether the agency made reasonable efforts to reunify the children with their parents, the issue is not whether an agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. In re Myers, Athens App. No. 02CA50, 2003-Ohio-2776 at ¶ 18; In re Bailey, Athens App. No. 04CA11, 2004-Ohio-3628. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).
 {¶ 51} In the case at bar, the trial court explicitly determined that ACCS used reasonable efforts and we believe that the record supports trial court's finding. ACCS provided the parents with case planning, referrals, and transportation. While ACCS may not have specifically directed the father to find a job, he already was under a domestic relations court order to join a seek work program. The domestic relations court issued this order over a year and one-half before ACCS filed for permanent custody, but he chose not to join the program until faced with permanently losing his children. Furthermore, the father held various part-time jobs throughout the history of the case, but quit so that he could find full-time employment. We note that he also spent a year and a half trying to obtain Social Security benefits as a means of living instead of trying to find full-time employment.
 {¶ 52} Accordingly, based upon the foregoing reasons, we overrule the father's second assignment of error.
 III CASE NUMBERS 05CA24 AND 05CA25 A {¶ 53} In her first assignment of error, the mother asserts that the trial court erred by granting ACCS permanent custody. She contends that the court ultimately based its decision upon her poverty, or her monetary inability to provide a home. We disagree.
 {¶ 54} Our review of the record reveals that the trial court examined the mother's past history in attempting to care for her children, as well as her current situation, when it considered ACCS request for permanent custody. The court did not rely solely upon her poverty to determine the permanent custody award. The court noted that the mother admitted her inability to care for the children. The court also determined that the children's best interests, which is the cardinal principle in permanent custody proceedings, warranted granting ACCS permanent custody. The court did not rely upon one factor alone, but looked to all of the statutory factors to determine that ACCS should receive permanent custody of the two children.
 {¶ 55} Accordingly, based upon the foregoing reasons, we overrule the mother's first assignment of error.
 B {¶ 56} Because the mother's second and third assignments of error are interrelated, we address them together.
 {¶ 57} In her second assignment of error, the mother asserts that the trial court erred by admitting her psychological report into evidence. She complains that doing so deprived her of her right to cross-examine witnesses. In her third assignment of error, the mother argues that the trial court erred by admitting the psychological report because it constitutes hearsay.
 {¶ 58} At trial, the mother's counsel objected when ACCS sought to introduce the psychological evaluations. He explained his objection as follows:
"Your honor, my only objection to it is they were submitted with a list of questions that were submitted by the agency and the state for Crystal's examination to be answered by the therapists. Now we don't have a chance to submit questions or cross examine this person. I don't think, I wonder about the fundamental fairness of that and if it's not objectionable since they did ask questions and the questions were specifically answered in the evaluation."
 {¶ 59} He continued:
"Well, it's like admitting it when they already ask [a] question. I'm not sure it's admissible under those circumstances when they ask questions and submit a question to the therapist there is a whole list of questions at the end like 10 questions that were ask[ed] of the therapist that are relevant to this case. We never had a chance to submit questions. I don't know. It's kind of a[n] interesting way of request[ing] an evaluation and then ask questions and they don't have to testify let[`]s just submit the answers. It's gives us [sic] an unbiased evaluation then. Look at the last pages. And in the discovery the questions that were submitted are indicated in the discovery too. I saw those. I saw this yesterday and I got this report that they were specifically answered."
In In re Mack, 148 Ohio App.3d 626, 2002-Ohio-4161,774 N.E.2d 1243, the court determined that a psychologist's report constituted inadmissible hearsay when the psychologist did not testify at the permanent custody hearing. The court further determined, however, that the court's error in admitting the report was harmless when other evidence amply supported its decision.
 {¶ 60} Likewise, in the case at bar, we conclude that any error committed by admitting the psychologist's report constitutes harmless error. "`Error in the admission of evidence is not ground for reversal unless substantial rights of the complaining party were affected or it appears that substantial justice was not done.' Petti v. Perna (1993),86 Ohio App.3d 508, 514, 621 N.E.2d 580. Further, `[i]n determining whether a substantial right of a party has been affected, the reviewing court must decide whether the trier of fact would have reached the same decision had the error not occurred.' Id., citingHallworth v. Republic Steel Corp. (1950), 153 Ohio St. 349, 41 O.O. 341, 91 N.E.2d 690." In re Mack, at ¶ 11.
 {¶ 61} Our review of the record reveals that evidence supports the trial court's decision to award ACCS permanent custody even without the report. The trial court cited both R.C.2151.414(E)(1) and (E)(2) in determining that the children cannot or should not be placed with either parent. The psychological report is relevant to the (E)(2) factor. Thus, even without the report, the record still supports an R.C. 2151.414(E)(1) finding.
 {¶ 62} Accordingly, based upon the foregoing reasons, we overrule the mother's second and third assignments of error.
 C {¶ 63} In her fourth assignment of error, the mother contends that the trial court's finding that her "chronic and severe mental and emotional illness substance abuse" supports awarding ACCS permanent custody is not supported by clear and convincing evidence.
 {¶ 64} After our review, we believe that even if clear and convincing evidence does not support the trial court's R.C.2151.414(E)(2) finding that the mother has chronic and severe mental and emotional illness and suffers from substance abuse, ample other evidence supports the court's finding that the children cannot be placed with either parent within a reasonable time. The court also found that R.C. 2151.414(E)(1) supported a finding that the children cannot be placed with either parent within a reasonable time. The mother has not challenged this finding. As we previously noted in our discussion of the father's first assignment of error, ample evidence supports this finding.
 {¶ 65} Accordingly, based upon the foregoing reasons, we overrule the mother's fourth assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellants costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Harsha, P.J., Abele, J. McFarland, J.: Concur in Judgment 
Opinion.
[2] We quoted the trial court's findings regarding the R.C.2151.414(E)(1) factor earlier in this opinion and will not repeat them here.