DECISION AND JUDGMENT ENTRY
{¶ 1} Terry Shifflet ("Father") appeals the judgment of the Athens County Court of Common Pleas, Juvenile Division, terminating his parental rights and granting permanent custody of his minor son, Herschel Shifflet, to Athens County Children Services ("ACCS"). Father contends that the trial court erred in granting ACCS's request for permanent custody, effectively denying his rights to substantive due process to the care, custody, and control of his child where the agency failed to make reasonable efforts to reunite him with the child. Because we find that the record contains some competent, credible evidence to support the trial court's finding that ACCS used reasonable efforts to reunite the child with Father, we disagree. Additionally, Father contends that the trial court denied him his constitutional right to substantive due process and equal protection of the laws by predicating its decision to terminate his parental rights based upon his poverty. Because we find that the trial court did not rely solely upon Father's poverty, but considered all of the relevant statutory factors to determine that ACCS should receive permanent custody of Herschel, we disagree. Accordingly, we overrule each of Father's assignments of error and affirm the trial court's judgment.
 I. {¶ 2} On July 12, 2005, Alicia Christman ("Mother") gave birth to Herschel Shifflet. On July 14, 2005, ACCS filed a complaint alleging that Herschel was neglected and dependent and seeking permanent custody of the child. ACCS alleged that: (1) Mother has been diagnosed with paranoid schizophrenia and/or schizoaffective disorder; (2) Mother is the biological mother of three other children, none of whom are in her custody, and that Mother's parental rights had been involuntarily and permanently terminated as to two of the children, while the other child was placed with its father; (3) Mother informed an ACCS caseworker that she has not been taking her prescribed medication for her mental health problems; (4) Mother had no consistent prenatal care; (5) Mother and Father have given Mother's parole officer, the hospital, and an ACCS caseworker three separate addresses of where they are living; (6) On July 13, 2005, a nurse found Mother upset in her hospital room, whereupon Mother informed the nurse that Father had threatened to hit her that morning; (7) at the time of the filing, Father had an outstanding warrant for his arrest, issued in January 2005 and arising out of an incident of domestic violence between Father and Mother on December 22, 2004; (8) according to the Athens County Sheriff Department and Athens Police Department, there was an active warrant for Father's arrest issued out of Scioto County and Father was previously arrested on May 28, 2005 on a warrant issued in Vinton County for alleged non-support; (9) initially the maternal grandmother wanted custody or at least a relationship with Mother's other children, but ACCS found her "wholly inappropriate[;]" (10) "Help Me Grow" attempted to locate Mother to provide her with services before Herschel's birth, but could not find her.
 {¶ 3} On July 13, 2005, the court placed Herschel in ACCS's custody by an ex parte emergency custody order. On July 14, 2005, the court conducted a hearing and continued the ex parte emergency custody order. The court also granted ACCS's request for paternity testing to determine whether Father was Herschel's biological father.
 {¶ 4} On August 10, 2005, ACCS filed a case plan with the court, identifying its concerns and stating the actions that the parents needed to take to resolve those concerns. The trial court conducted an adjudication hearing on August 12, September 6, September 9, December 7, and December 15, 2005.[1] During the adjudicatory hearing, the trial court heard the testimony of ACCS caseworker, Liesl Gyurko; Lt. Michael Walton, of the Logan Police Department; Sharon Burt, L.I.S.W., a supervisor at Tri-County Mental Health who was involved in Mother's treatment; Mother's sister, Rebecca Harden; Mary Ann Howard, Mother's case manager at Tri-County Mental Health; and ACCS caseworker, Kathi VanMeter.
 {¶ 5} On December 19, 2005, the trial court adjudicated Herschel neglected and dependent. The court found that the parents demonstrated that they are unable to adequately care for the child and that they did not have appropriate housing for him. Further, the court found: "[Father] was arrested and incarcerated both after and immediately before the complaint was filed. The mother has chronic, severe mental health problems for which she is prescribed medication and counseling. She did not take the medications and did not attend counseling as required. The mental health agency case manager would take the time to go to the mother's home and the mother would refuse to meet with her. The mother was involuntarily admitted to a psychiatric hospital [after] the child was taken into protective custody. Further the mother did not take the steps necessary to ensure adequate pre-natal care even though she has had 3 other children permanently removed from her care, 2 through involuntary termination of her parental rights. Further the father did not encourage the mother to attend her pre-natal care doctor's visits, and has actively discouraged her from taking her mental health medications."
 {¶ 6} The court also found that ACCS provided the family with foster care, visitation, a Help Me Grow referral, counseling referrals, and case management, but that the services did not make it possible for the child to return home, as the circumstances leading to his removal from the home still exist. Consequently, the court found that returning Herschel to the parents' home would not be in his best interest. Finding that there was no suitable relative available to take custody, the trial court continued ACCS's temporary custody pending the outcome of the disposition hearing.
 {¶ 7} The court conducted a dispositional hearing on January 19, 20, and 31, 2006. During that hearing, the court heard testimony from: Cheryl Shifflet, Father's former wife; Father; Mother; ACCS case aide Kelly Forshey; Herschel's guardian ad litem, Marilyn Neason; ACCS caseworker Kathi VanMeter; Herschel's foster mother, Terry Beitzel; Mary Ann Howard, Mother's case manager at Tri-County Mental Health; Mother's guardian ad litem, Elaine Wetzel; and Mother's psychiatrist, Dr. Margaret Messerly.
 {¶ 8} On March 21, 2006, the trial court awarded permanent custody to ACCS. The court found that permanent custody would serve the child's best interests. In evaluating the best interest factors enumerated in R.C. 2151.414(D)(1)-(5), the court stated: (1) "This child was removed at birth. He is now seven months old. He has no relationship or interactions with any half-siblings. Visitations for the parents have been regularly offered and available but woefully underutilized. This is due in part to the considerable blocks of time when mother was either in the psychiatric hospital or incarcerated. However, it is also due to mother's irresponsibility in general. Paternity was not immediately established but even once determined, father's efforts at visitation were sporadic. This child has received appropriate care and nurturing in the temporary custody of ACCS and very good direct care in the foster home." (2) "The child is seven months old. The guardian ad litem recommends [that] permanent custody [is] in the best interest of the child." (3) "Herschel has been in the temporary custody of ACCS since birth and has resided in the same foster home continuously." (4) "This child needs and deserves a legally secure placement that can only be accomplished with a grant of permanent custody to ACCS. Herschel is the fourth child born to [Mother] and each has a different father. None live with her. Two of her children have been placed in the permanent custody of ACCS as a result of the involuntary termination of her parental rights and responsibilities. Father has two other children who live with their mother. He is seriously delinquent in payment of a very minimal child support order and has been jailed twice for violating a civil protection order regarding the mother of those children. Similarly, he was twice charged with domestic violence against [Mother], including one complaint signed by her as the complainant. [Mother] has been psychiatrically hospitalized repeatedly and both parties have been incarcerated during portions of this proceeding." Additionally, with respect to the factors enumerated in R.C. 2151.414(E)(7)-(11), the court found that "Mother has had her parental rights permanently and involuntarily terminated with respect to two previous children."
 {¶ 9} The court also found that the child cannot be placed with either parent within a reasonable time and should not be placed with the parents. The court explained:
 {¶ 10} "Regarding R.C. 2151.414(E)(11), [Mother's] parental rights were permanently and involuntarily terminated with respect to Jordan (Athens; case #20130023) and Courtney (Athens; case #20033059). This also eliminates (with respect to [Mother]) the "best efforts" requirement for ACCS.
 {¶ 11} "Regarding R.C. 2151.414(E)(2), [Mother] suffers from mental illness. While the specific diagnosis has varied slightly over time and depending on the attending professional, it is clear that she has substantial disorder of thought and/or mood. Dr. Messerly testified that her diagnosis is schizoaffective, bi-polar type; rule out bi-polar, severe with extreme manic features. She went on to explain that if [Mother's] psychosis is separate from her mood disorder, then she is schizoaffective. Dr. Lee of Worthington Center summarized his analysis as follows: `[Mother] presents as a mentally ill individual with prominent psychotic symptoms, affective instability consistent with a Bi-Polar I Disorder, and significant affective dysregulation as well as lack of control over her emotions and actions.'
 {¶ 12} "While it is not legally necessary to make this finding with respect to [Mother], given the existence of prior involuntary terminations, it is her severe mental illness and history of resistance to treatment and medications that compel the finding that she will not be able to provide an adequate, permanent home — presently, and as anticipated, within the one year period of R.C. 2151.414(E)(2)."
 {¶ 13} The trial court also made a finding, pursuant to R.C.2151.414(E)(4) that "neither parent has demonstrated a commitment toward the child in the form of support, visitation, communication and provision of an adequate, permanent home for the child." The court explained: "Mother receives SSI and father is `fighting' for social security disability. Neither has provided any financial support for this child. Many visits that were available to these parents were missed because of hospitalizations and incarcerations. When not in the hospital or jail, mother attended several visits toward the end of the case. Father attended eleven of forty-seven visits. [Father] does not have a valid operator's license. Throughout this case the parties have failed to establish adequate permanent housing suitable for this child. On the final day of hearing, January 31, 2006, the parties announced that they had just rented an apartment. This revelation came after months of `fixing up' a trailer that they would never let ACCS visit.
 {¶ 14} "The unacceptable shortcomings of these parties are a combination of their limited abilities and their general irresponsibility. Even with two highly experienced attorneys and a guardian-ad-litem for mother, these parents failed to attend a physical therapy appointment for their son in the last week of this proceeding. As judge, I had specifically urged them to attend and explained the importance to them. Father's excuse was that he had a chance to "look for work". Mother didn't have reliable transportation. Neither parent asked for help or even called to say they wouldn't be attending."
 {¶ 15} The trial court noted that, pursuant to R.C.2151.419(A)(2), it was not required to make a finding that ACCS made reasonable efforts to reunite the child with Mother due to the prior involuntary termination of her parental rights with regard to two other children. However, the trial court went on to state: "These parties are not married and mother has given birth to multiple children from multiple mates. Upon mother's assertion that Mr. Shifflet was the father, ACCS included him in the case and proceeded to establish paternity. Both parties were afforded visitation, service referrals, transportation assistance and even money for car repairs. Other agencies also provided transportation and assistance.
 {¶ 16} "These efforts did not prevent or eliminate the need for removal because mother and father were unable or unwilling to provide an adequate permanent home and stable conditions for raising a child. This child was removed from the hospital at birth, primarily because of mother's mental health issues and lack of parenting skills. Parentage had to be established and Mr. Shifflet's circumstances needed to be investigated. That investigation revealed that he had no permanent residence, no income, no operator's license, no children in his care or custody, a history of non-support, violations of court orders, domestic violence allegations by this mother, and a criminal record, including a felony for which he served six months.
 {¶ 17} "In short, these two are and will remain dependents of our society. There is some testimony suggesting that [Mother's] mental condition can become more stabilized if she is faithful to her treatments, medications and counseling. This is encouraging for this twenty-three year old woman. However, it is not convincing evidence that she can handle the reasonable responsibilities of parenting."
 {¶ 18} Therefore, the trial court awarded ACCS permanent custody of Herschel. Father timely appeals, raising the following assignments of error: I. "The trial court erred by granting Children Services' request for permanent custody in the absence of reasonable efforts by the agency, denying appellant substantive due process rights to the care, custody and control of his child. II. "The trial court denied the appellant his substantive due process and equal protection rights to both federal and state constitutions when it predicated its decision to terminate his parental rights on his poverty."
 II. {¶ 19} In his first assignment of error, Father contends that the trial court's award of permanent custody to ACCS deprived him of his substantive due process rights where the agency failed to make reasonable efforts to reunite him with his son.
 {¶ 20} A parent has a "fundamental liberty interest in the care, custody, and management of his or her child." Santosky v.Kramer (1982), 455 U.S. 745, 753. The Ohio Supreme Court has noted that "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" In reHayes (1997), 79 Ohio St. 3d 46, 48, quoting In re Smith
(1991), 77 Ohio App.3d 1, 16. However, the parent's rights are not absolute. Instead, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principal to be observed.'" In re Cunningham (1979), 59 Ohio St.2d 100, 106, quoting In re R.J.C. (Fla.App. 1974), 300 So.3d 54, 58. Consequently, the state may terminate parental rights when the child's best interest demands such action.
 {¶ 21} There are two ways that an authorized agency may seek to obtain permanent custody of a child under Ohio Law. The agency may first obtain temporary custody and then subsequently file a motion for permanent custody, or the agency may request permanent custody as part of its original abuse, neglect, or dependency complaint. See R.C. 2151.413, R.C. 2151.27(C), and R.C.2151.353(A)(4). Here, ACCS filed a complaint seeking permanent custody pursuant to R.C. 2151.353(A)(4) as the original disposition.
 {¶ 22} Pursuant to R.C. 2151.35 and Juv.R. 29 and 34, proceedings involving the termination of parental rights must be bifurcated into separate adjudicatory and dispositional hearings. See, In re Baby Girl Baxter (1985), 17 Ohio St.3d 229, at paragraph one of the syllabus. Once a court adjudicates a child abused, neglected or dependent, R.C. 2151.353(A)(4) permits the court to commit the child to the permanent custody of a public children services agency "if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child."
 {¶ 23} R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. The statute provides, in relevant part, that if the court finds by clear and convincing evidence that any one of the following factors exists, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: * * * (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child; * * * (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2141.353 or 2151.415 of the Revised Code with respect to a sibling of the child; * * * (16) Any other factor the court considers relevant." R.C. 2151.414(E)
 {¶ 24} In determining whether to grant permanent custody to a children services agency, a trial court should be guided by the underlying principles of R.C. Chapter 2151, "To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety[.]" R.C. 2151.01(A).
 {¶ 25} When a children services agency obtains temporary custody of a child, the agency is statutorily required to develop a case plan for the child in their custody. See R.C. 2151.412. Additionally, R.C. 2151.419(A)(1) provides, in relevant part, that: "* * * at any hearing held pursuant to section * * *2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * that filed the complaint in the case removed the child from the home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."
 {¶ 26} Moreover, the statute provides that the child's health and safety shall be paramount in determining the reasonableness of the agency's efforts. Id. We have recognized that: "In determining whether the agency made reasonable efforts to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." In reLewis, Athens App. No. 03CA12, 2003-Ohio-5262, at ¶ 16
(Citations omitted.) "`Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." Id. citing In re Fast (Mar. 25, 1992), Summit App. No. 15282.
 {¶ 27} ACCS bears the burden of proving its case, including the fact that it has made reasonable efforts with respect to Father, by clear and convincing evidence. In re Schmidt (1986),25 Ohio St.3d 331, 335; R.C. 2151.414(B)(1); R.C. 2151.419(A)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." In reEstate of Haynes (1986), 25 Ohio St.3d 101, 103-04.
 {¶ 28} We will not reverse the judgment of the trial court if there is some competent, credible evidence going to all the essential elements of the case. State v. Schiebel (1990),55 Ohio St.3d 71, 74. We give the trial court's final determination "the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In re Alfrey, Montogomery App. No. 01CA0083, 2003-Ohio-608, at ¶ 102, citing Miller v. Miller
(1988), 37 Ohio St.3d 71, 74. We give deference to the trial court as the trier of fact because it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80. This deference to the trial court in matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger (1997), 77 Ohio St.3d 415, 419.
 {¶ 29} Here, the trial court found that ACCS made reasonable efforts to prevent the removal of the child from the home, to eliminate the continued removal of the child from the home, and to make it possible for the child to return safely to the home. The record reflects that ACCS implemented a case plan for both parents pursuant to R.C. 2151.412. In the case plan, the agency identified the following concerns relevant to Father: "Terry Shifflet is the alleged father. Paternity has not been established. Terry is currently incarcerated with a possible release date of 8-12-05 at the South East Ohio Regional Jail. Terry has no stable income, no housing and has a severe history of domestic violence and substance abuse." The agency then listed eight things that Father needed to do to address these concerns, including: (1) contact Athens County Child Support Enforcement Agency to schedule and complete paternity testing by September 1, 2005;[2] (2) contact ACCS to schedule visitation with Herschel; (3) sign all requested releases within twenty-four hours of request; (4) cooperate with the home study process and referrals to service providers for assessments; (5) submit to random drug screens within three hours of request; (6) pay child support; (7) provide social and medical history to ACCS; (8) identify relatives willing and able to care for Herschel.
 {¶ 30} ACCS caseworker Kathi VanMeter testified that the agency provided this family with gas vouchers, financial assistance, transportation, and foster care. Father acknowledged that ACCS provided financial assistance to repair Mother's car upon her request.
 {¶ 31} Ms. VanMeter also indicated that she attempted to perform a home study to determine whether Mother and Father's residence on Bethel Hill Road was suitable for Herschel, and even went so far as to set up a date and time to go, but stated that the parents told her not to come. In her testimony she indicated that the parents repeatedly represented that they were fixing up the home, and that it was not ready for her to see. Ms. VanMeter acknowledged that the agency did not offer Mother and Father any assistance with the repairs to the Bethel Hill Road residence. However, she also noted that trailer was located on the land of Mother's sister property, and even if it were fixed up and suitable for Herschel, it would not have been a permanent residence for the family.
 {¶ 32} Additionally, Ms. VanMeter testified that the agency was in contact with two relatives regarding the possibility of placing Herschel in their custody. She indicated that the agency completed home studies for both relatives, but that the relatives decided not to pursue Herschel's placement in their respective homes.
 {¶ 33} The testimony of Ms. VanMeter and ACCS case aide Kelly Forshey revealed that the agency scheduled the parents a total of forty-six visits with Herschel from the time the agency assumed emergency custody until the date of the final dispositional hearing. Ms. Forshey indicated that, of the thirty-five visits she was present and assigned to supervise, Father only attended ten times. He attended one additional visit, supervised by Ms. VanMeter, and one of Herschel's medical appointments. Ms. VanMeter indicated that when she arrived at the doctor's office for Herschel's appointment, Father "made a beeline for the door," and indicated that he had to leave to go to work. Ms. VanMeter testified that she sent calendars with the time and date that the visits would occur to the Bethel Hill residence, and further indicated that when she talked to Father about the dates and times of the visits, he indicated that they were fine for his schedule.
 {¶ 34} Both Ms. VanMeter and Ms. Forshey testified that Father never called to cancel or otherwise notify them that he would be unable to attend scheduled visits. In his testimony, Father admitted that he did not call to cancel his visitations during the times that he was not in jail because it "slipped my mind."
 {¶ 35} Ms. VanMeter testified that in addition to the parents' scheduled visits with Herschel, the parents were also invited to attend Herschel's physical therapy appointments. At the conclusion of the January 20, 2006 dispositional hearing, the trial court and counsel discussed Herschel's physical therapy appointment scheduled for the following Thursday. Despite the court informing the parents about the importance of their attendance, and the court's effort to ensure that they were aware of both the time and the location of that appointment, neither Father nor Mother attended.
 {¶ 36} As demonstrated by the foregoing, the record contained substantial evidence to support the trial court's conclusion that ACCS made reasonable efforts to reunify Herschel with Father, despite the fact that the agency sought permanent custody as the original disposition in the case. However, the record reveals that Father failed to fully utilize the services offered to him. Accordingly, we find that Father's first assignment of error is without merit.
 III. {¶ 37} In his second assignment of error, Father contends that the trial court deprived him of his constitutional rights to substantive due process and equal protection of the laws when it predicated its decision to terminate his parental rights upon his poverty. Father argues that the only problems preventing him and Mother from parenting Herschel relate to Mother's psychological problems and the couple's poverty.
 {¶ 38} However, our review of the trial court's decision and the record reveals that the court did not rely solely upon Father's poverty to determine the award of permanent custody to ACCS. While the court did consider Father's lack of income, it also determined that Father's failure to regularly exercise visitation and failure to attend the child's physical therapy appointments demonstrated Father's lack of commitment to the child in accordance with R.C. 2151.414(E)(4). The trial court also found that on the final day of the dispositional hearing, the parties announced that they had just rented an apartment — a revelation that came after months of "fixing up" a trailer that the parents refused to permit the ACCS case worker to visit. The record supports these findings.
 {¶ 39} Additionally, the trial court noted that Father: (1) failed to support his other two children, as evidenced by his substantial child support arrearage; (2) had a history of domestic violence, and was jailed for violating a domestic violence civil protection order issued to the mother of his other two children; (3) was twice charged with domestic violence against Mother; and (4) was incarcerated for a period of time during the pendency of this action. The record supports these findings, and Father does not dispute them.
 {¶ 40} Furthermore, the trial court also determined that the child's best interests warranted the award of permanent custody to ACCS, and we note that Father has not assigned any error with regard to the trial court's best interest determination. Because, the trial court did not rely solely upon Father's poverty, but looked to all of the relevant statutory factors in determining that ACCS should receive permanent custody of Herschel, we overrule Father's second assignment of error. See In re Link,
Athens App. Nos. 05CA23, 05CA24, and 05CA25, 2006-Ohio-529, at 53. Accordingly, we affirm the judgment of the trial court.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that costs herein be taxed to the appellant.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as the date of this Entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, P.J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.
[1] Although the trial court found in its December 19, 2005 entry that it also conducted the hearing on September 6 and 9, 2005, the record does not contain any transcript for those hearing dates, despite Father's request that the court reporter "prepare a transcript of all proceedings held on and in the captioned matter[.]" Nor has Father submitted a statement of the evidence or proceedings or an agreed statement pursuant to App.R. 9(C) or (D). While the record does contain a warrant to convey Mother from the Franklin County Correction Center to the hearing on September 6, and numerous subpoenas duces tecum, for hearings on those dates, it does not contain any hearing notices for those dates. Nor does it contain any entries purporting to continue hearings set for those dates. Thus, we are unable to ascertain from the record before us whether such hearings actually took place. However, because the transcript provided, whether complete or partial, forms an adequate basis our review Father's assignments of error, we proceed to address them. See App.R. 9(B); Tyrrell v. Invest. Assoc., Inc. (1984),16 Ohio App. 3d 47, 50.
[2] Although the agency requested, and the court ordered paternity testing, the record does not reflect whether that testing occurred or what the results of such testing were. However, we note that throughout the proceedings below, Terry Shifflet acknowledged that he is Herschel's father.