[Cite as *In re A.M.1*, 2010-Ohio-5837.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

IN THE MATTER OF:                              :
 A.M.1,
 G.M.,              :          Case Nos.  10CA21        10CA27
 B.M.,                                    10CA22     10CA28
 K.M., AND           :                    10CA23     10CA29
 A.M.2,                                   10CA24     10CA30
                          :               10CA25     10CA31
ADJUDICATED DEPENDENT                      10CA26
 CHILDREN.                 :
                                    DECISION AND JUDGMENT ENTRY

                                          :

_____

APPEARANCES:

COUNSEL FOR APPELLANT     Frank A. Lavelle, 8 North Court Street,     MARY
HALL:                2nd Floor, P.O. Box 661, Athens, Ohio
45701

COUNSEL FOR APPELLANT     William R. Biddlestone, 8 North Court
 GEORGE MAFFIN:           Street, 3rd Floor, Athens Ohio 45701

COUNSEL FOR APPELLEE:     C. David Warren, Athens County Prosecuting
                          Attorney, and George Reitmeier, Athens County
                          Assistant Prosecuting Attorney, 1 South Court Street,
                          Athens, Ohio 45701

_____
CIVIL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED: 11-22-10

ABELE, J.

{¶ 1}   These are consolidated appeals[1] from Athens County Common Pleas

---

[1] Case numbers 10CA21, 10CA22, 10CA23, 10CA24, and 10CA25 represent the father's appeal regarding A.M.1, G.M., B.M., K.M., and A.M.2, respectively.   He filed one brief to address all five case numbers.   Case number 10CA26 is the mother's

Court, Juvenile Division, judgments that awarded Athens County Children Services (ACCS) permanent custody of four children: (1) A.M.1, born July 16, 1997; (2) B.M., born August 2, 1994; (3) K.M., born May 23, 1996, and (4) A.M.2, born November 24, 1998. The trial court denied ACCS's request for permanent custody of a fifth child, G.M., born November 27, 1992.

**{¶ 2}** Appellant Mary Hall, the children's natural mother, raises the following assignments of error for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "TERMINATION OF PARENTAL RIGHTS WAS AGAINST THE EXPRESS WISHES OF THE CHILDREN, AND WAS NOT IN THEIR BEST INTERESTS."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "THE COURT BELOW FAILED TO SPECIFICALLY DETERMINE THAT GRANTING PERMANENT CUSTODY TO ACCS AND TERMINATING ALL PARENTAL RIGHTS, WAS THE ONLY WAY TO ACHIEVE A LEGALLY SECURE PLACEMENT FOR THE CHILDREN."

**{¶ 3}** George Maffin, the children's natural father, raises the following assignments of error for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT'S DECISION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
>
> SECOND ASSIGNMENT OF ERROR:

---

notice of appeal that lists all five of the children's trial court case numbers. Case numbers 10CA27, 10CA28, 10CA29, 10CA30, and 10CA31 represent the mother's appeal with respect to A.M.1, G.M., B.M., K.M., and A.M.2, respectively. The mother, like the father, has filed one appellate brief to address all six case numbers.

"THE TRIAL COURT'S DECISION VIOLATES THE EQUAL PROTECTION CLAUSES OF BOTH THE STATE AND FEDERAL CONSTITUTIONS, AS WELL AS SUBSTANTIVE DUE PROCESS CONSIDERATIONS."

{¶ 4} A.M.1 has cerebral palsy. Appellants apparently experienced difficulty providing or obtaining proper care for this child. On November 28, 2006, ACCS sought, and the trial court granted, ex parte emergency custody of A.M.1. On November 29, 2006, ACCS filed a complaint and alleged A.M.1 to be a neglected and dependent child. The complaint alleged that: (1) A.M.1 has severe cerebral palsy and is not receiving proper treatment; (2) the family is being evicted from the home; and (3) A.M.1's social security benefits provide the family's only income. ACCS also filed complaints that alleged the remaining children are neglected and dependent due to the family's lack of appropriate housing and income.

{¶ 5} On December 27, 2006, the parties agreed to admit dependency at the adjudication hearing. On January 2, 2007, the trial court adjudicated the children dependent, dismissed the neglect allegations and placed all five children in ACCS's protective custody. The court further directed that A.M.1 remain in the care and control of Andrea Decker, the father's sister, until further review.

{¶ 6} On April 22, 2008, ACCS filed a motion to modify the disposition from protective supervision to temporary custody. ACCS alleged that: (1) the parents had been evicted twice in the past six months; (2) the children had extensive school absences; (3) A.M.1 had not been receiving necessary therapy; and (4) A.M.1 had not been properly fitted for a wheelchair. On August 28, 2008, the court denied ACCS's motion for temporary custody.

**{¶ 7}** On October 21, 2008, the trial court granted ACCS ex parte emergency custody. On October 22, 2008, ACCS filed a motion for temporary custody. On that same date, the court held an emergency shelter care hearing. Andrea Decker, the father's sister, testified that the family has been living in her home. Decker stated that a few days before the hearing, she heard the mother yelling at A.M.1 and "telling her to shut the fuck up and stop crying." She heard a "hitting" noise and heard A.M.1 stating "ow, ow, ow." During this incident, the mother stated to another child, B.M., "that she fuckin' hated her and that she was a stupid bitch. I can't fuckin' stand you. I hate you." She also observed the mother hit A.M.2 in the face with the back of her hand. The court subsequently continued its order placing the children in ACCS's temporary custody. On December 10, 2009, ACCS filed a motion for permanent custody of the children.

**{¶ 8}** On February 10, 2010, the guardian ad litem (GAL) filed his report and stated that the children appear to be "thriving in foster care." All the children expressed a desire to be placed together, whether at home or in some other placement. K.M. stated that she would not want to be returned to her mother's custody. The GAL noted that "[n]one of the children seems to view the prospect of [p]ermanent [c]ustody as something terrible in and of itself, just so long as they are able to see each other." The GAL stated that the parents have not "done well in working to complete the [c]ase [p]lan." The father was incarcerated for several months and while incarcerated, the mother attended very few visits with her children. Also, neither parent has a steady income source. In fact, the father actually wrote letters to some of the children and

asked them for money.   The parents have been evicted from their home and presently reside with Amanda Decker in a three-bedroom mobile home.   Neither parent has completed mental health or substance abuse treatment.   The mother tested positive for Oxycodone in August of 2009, skipped a November 2009 drug screening, and in early 2010, admitted to the case worker that she had recently taken drugs.   In July 2009, the mother was charged with obstructing official business and two counts of endangering children for driving under the influence with two children present in the vehicle.   The mother missed her court hearing regarding these charges and was not allowed to visit the children while the warrant remained outstanding.   Although the mother promised the case worker that she would take care of the warrant "right away," she did not. Since the mother lost her job at Foodland, she has been either unable or unwilling to find other employment.

{¶ 9}   The GAL further reported that the father described himself as an alcoholic.   The "[t]he most pressing concern * * * is the apparent inability or unwillingness of the parents to take seriously their parenting responsibilities by working with ACCS and other agencies to complete the [c]ase [p]lan."   The GAL opined that although the parents "do appear to care for their children at some level, [they] have not done enough to provide their children with a safe, healthy, and nurturing environment." The GAL further stated that the parents do not "appear to have any plans to do so in the future," but instead make "vague promises about looking into possibilities of employment."   The GAL stated: "These parents do not have housing of their own, they do not have any reliable source of income, they do not have clear plans to obtain either

housing or employment, and they have manifested a cavalier attitude towards providing for their children and managing their own psychological and substance abuse problems." The GAL thus recommended that the court award ACCS permanent custody of the children.

{¶ 10} On February 17, March 10, and March 15, 2010, the trial court held permanent custody hearings. SEPTA Correctional Facility Program Manager Scott Weaver testified that the father entered the program on May 8, 2009 due to his fifth-degree felony drug possession conviction. Weaver stated that the father did not successfully complete the SEPTA program because he violated the terms of one of his furloughs. SEPTA then returned him to the common pleas court for sentencing.

{¶ 11} Linda Donohue, foster parent to A.M.1 and B.M., testified that she believes A.M.1 has "progressed quite a bit." Donohue explained that when A.M.1 first arrived in her home, she did not know the alphabet. Now, however, A.M.1 knows the alphabet. Donohue also stated that sometimes the parents did not appear for scheduled visitations, and the children would be angry.

{¶ 12} ACCS caseworker June Safranek stated that ACCS has been intermittently involved with the family since 2001. Safranek does not believe that the parents have "made a serious commitment to regain custody of their children," and that permanent custody would serve the children's best interests because:

> "[the mother has] not been able to support herself let alone the children. She did not cooperate with the Department of Jobs and Family Services to even work off her hours so that she, so that she could continue getting welfare benefits because if you haven't had them for a period of time and you're not sanctioned you can get them up to three years. But she would get herself in a position where she would not, uh,

she would not attend work or [the father] would not attend work and they would become sanctioned.  They would not ask for help saying that they didn't want, they wanted to be independent.  They didn't want to ask for help."

{¶ 13} ACCS Family Services Supervisor Jennifer Hosek testified that the agency has had thirty-two referrals regarding the family and opted to request permanent custody because "years upon years [passed and the parents failed to] address the same concerns[:] housing, basic needs, school attendance, medical condition of [A.M.1]."  Hosek stated that ACCS "had offered numerous case plans to address these issues and [the parents] had failed continuously."  She further explained that the mother attended only five out of a possible forty-four visits between July 2009 and December 10, 2009.  Hosek believes that permanent custody is in the children's best interests "[s]o that they can have the stability that they have had since they have been in care and that they can continue to attend school on a regular basis and that they can get all of their needs met."  She explained that ACCS considered options other than permanent custody, but they  did not want to place the children in "long-term foster care [be]cause we don't want to shut the door for any of the children to be placed together as a sibling group."  Hosek further stated that ACCS considered relative placement, but the relatives "stated that they will take one child but they can't take all. Some of them say they are burned out and they don't want involved any longer, and our goal is for them to be placed together and to remain together."

{¶ 14} Scott Carson, the guardian ad litem, testified that all of the children expressed a desire to be reunited with their parents.  He explained, however, his belief that permanent custody is in the children's best interests:

"* * * [A]lthough the interactions with the parents seem to be fine, and I do think that the parents are very caring towards the children in their own way and that the children feel a fondness for the parents, * * * I'm sort of overwhelmed by the history of the case * * * . The homelessness, the lack of permanent or * * * very long term employment, * * * the sort of hand to mouth existence that they've been living and I contrast that with the way the children are flourishing now in their foster placements, and it just seems to me that in the long-term interest of the children to have a kind of security for a healthy environment, good role models, better boundaries to their living and choice making, and better role models for their choice making it does seem to me that in the long-term it would be better for them to be put into permanent custody as a sibling unit."

{¶ 15} On May 12, 2010, the trial court granted ACCS permanent custody of A.M.1, B.M, K.M., and A.M.2. The court, however, denied ACCS's motion that requested permanent custody of G.M. Instead, the court ordered that G.M. remain in ACCS's temporary custody.

{¶ 16} With respect to the children's best interests, the court stated:

"As noted earlier in this decision, there is a strong surface loyalty in this family. The children profess love for their parents, and the observed visits with all family members demonstrate that relationship. The oldest child, G.M. * * * is viewed as a big brother by all and would support almost any arrangement that would reunite the family. He is already seventeen years old and has the intelligence to complete high school and hopefully the motivation. The three girls (ages fifteen, thirteen, and twelve) are close and appropriate, and the youngest boy A.M.2 (age eleven) has been loved and cared for by his older siblings.
A.M.1 has cerbral [sic] palsy and spends the bulk of her day in a wheelchair. Her parents and siblings have been her care providers. At school she is provided an aide. Her intellectual function is also minimal, and she simply believes she will be 'taken care of' her whole life.
All the children are thriving in the various foster care settings where they find themselves."

{¶ 17} With respect to the children's wishes, the court observed:

"The children consistently report a desire to live with their parents. Absent that possibility, they would like to be placed together as a sibling group. If that is not possible, the girls would like to be placed together.

The guardian ad litem's report and the statements of the children's counsel have informed the Court of their desires."

{¶ 18} Regarding the third best interest factor, the children's custodial history, the court stated:

"All five children have been in the continuous temporary custody of ACCS, living in foster care for more than twelve of the latest twenty-two months prior to the filing of this motion for permanent custody. The parents have moved frequently throughout the history of this case and often need to live with family members to have shelter. Currently, the parents are living with one of [the father]'s sisters. Even without the children in their custody they have proved unable to acquire and maintain minimally acceptable housing. Neither parent has maintained regular employment."

{¶ 19} The court next considered the children's need for a legally secure permanent placement and whether it can be achieved without granting permanent custody to ACCS:

"Every child would benefit from a legally secure placement, and that appears particularly advisable for the four youngest children. Regardless of the love, or at least loyalty, that is expressed reciprocally in this family, these parents have not resolved any of the issues required to allow the return of their children. Much time and social service effort has been made available without a positive outcome.
The oldest child does not wish to be considered for adoption and will likely always maintain a child-parent relationship with [his parents]. The four youngest may succeed in adoption and deserve the chance to be children, finishing their years of minority in an actual home with a responsible family structure."

{¶ 20} The court found the R.C. 2151.414(E)(7)-(11) factors inapplicable.

{¶ 21} The trial court concluded that R.C. 2151.414(B)(1)(d) applied in that the children had been in ACCS's temporary custody for twelve of twenty-two consecutive months. The court noted that it adjudicated the children dependent on December 27,

2007, that ACCS filed its permanent custody motion on December 10, 2009, and that the children have been in continuous foster care since October 2008. The court thus awarded ACCS permanent custody of the four children and terminated appellants' parental rights.

{¶ 22} These appeals followed.

I

{¶ 23} Before we review the merits of appellants' assignments of error, we first address a jurisdictional issue. Both appellants seek to appeal the trial court's judgment relating to G.M. The trial court, however, did not grant ACCS's request for permanent custody of G.M. A trial court's decision to deny a permanent custody request and continuing a temporary custody order does not constitute a final appealable order. See In re Adams 115 Ohio St.3d 86, 2007-Ohio-4840, 873 N.E.2d 886, syllabus ("A trial court order denying the motion of a children-services agency to modify temporary custody to permanent custody and continuing temporary custody is not a final, appealable order under R.C. 2505.02(B)(1) or (2)."). Therefore, we dismiss the appeals involving G.M.–case numbers 10CA22 and 10CA28.

II

{¶ 24} Appellants' four assignments of error generally center upon the trial court's decision to grant permanent custody. Therefore, some basic principles that govern appellants' assignments of error and, to this extent, we have combined them.

A

STANDARD OF REVIEW

{¶ 25} Generally, an appellate court will not reverse a trial court's permanent custody decision if some competent and credible evidence supports the judgment. In re Perry, Vinton App. Nos. 06CA648 and 06CA649, 2006-Ohio-6128, at ¶40, citing State v. Schiebel (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. Thus, our review of a trial court's permanent custody decision is deferential. See In re Hilyard, Vinton App. Nos. 05CA600, 05CA601, 05CA602, 05CA603, 05CA604, 05CA606, 05CA607, 05CA608, 05CA609, 2006-Ohio-1965, at ¶17. Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Schiebel, 55 Ohio St.3d at 74. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger (1997), 77 Ohio St.3d 415, 419, 674 N.E.2d 1159; see, also, In re Christian, Athens App. No. 04CA10, 2004-Ohio-3146.

B

STANDARD FOR GRANTING PERMANENT CUSTODY

{¶ 26} A trial court may not grant a permanent custody motion absent clear and convincing evidence to support the judgment.   The Ohio Supreme Court has defined "clear and convincing evidence" as:

> "The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.   It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases.   It does not mean clear and unequivocal."

In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23; see, also, Schiebel, 55 Ohio St.3d at 74.   In reviewing whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."   Schiebel, 55 Ohio St.3d at 74.

C

PERMANENT CUSTODY PRINCIPLES

{¶ 27} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children.   Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Murray (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169; see, also, In re D.A., 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829.   A parent's rights, however, are not absolute.   See D.A. at ¶11.   Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'"   In re Cunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (quoting In re R.J.C. (Fla.App.1974), 300 So.2d 54,

58).   Thus, the state may terminate parental rights when a child's best interest demands such termination.   D.A. at ¶11.

{¶ 28} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.   The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency.   See R.C. 2151.414(A)(1).   Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:

> (A) To provide for the care, protection, and mental and physical development of children * * *;
> * * *
> (B) To achieve the foregoing purpose[ ], whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.

D

PERMANENT CUSTODY FRAMEWORK

{¶ 29} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the

child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

**{¶ 30}** Thus, before a trial court may award a children services agency permanent custody, it must find: (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies; and (2) that awarding the children services agency permanent custody would further the child's best interests.

**{¶ 31}** Pursuant to the plain language of R.C. 2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. See, e.g., In re T.F., Pickaway App. No. 07CA34, 2008-Ohio-1238, at ¶23; In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205; In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11. Consequently, when considering a R.C. 2151.414(B)(1)(d) permanent custody motion, the only other consideration becomes the child's best interests. A trial court need not conduct an R.C. 2151.414(B)(1)(a) analysis of whether the child cannot or should not be placed with either parent within a reasonable time. Dyal; see, also, In

re Berkley, Pickaway App. Nos. 04CA12, 04CA13, and 04CA14, 2004-Ohio-4797, at ¶61.

{¶ 32} In interpreting R.C. 2151.414(B)(1), the Ohio Supreme Court held that the child must have been in the custody of the agency for at least twelve of the previous twenty-two months before the agency files a permanent custody motion in order for the trial court to grant permanent custody based on R.C. 2151.414(B)(1)(d) grounds. In re C.W., 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, at ¶¶ 26. "In other words, the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period set forth in R.C. 2151.414(B)(1)(d)." Id.

E

BEST INTERESTS

{¶ 33} R.C. 2151.414(D) requires a trial court to consider specific factors to determine whether a child's best interests will be served by granting a children services agency permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the

agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[2]

III

---

[2] R.C. 2151.414(E)(7) to (11) provide as follows:

(7) The parent has been convicted of or pleaded guilty to one of the following:

(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;

(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(c) An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.

**{¶ 34}** In the case at bar, both appellants argue in their first assignments of error that competent and credible evidence does not support the trial court's finding that permanent custody serves the children's best interests.[3]   We disagree.

**{¶ 35}** In the case sub judice, the trial court's judgment sets forth a thorough best interest analysis.   The court examined each of the R.C. 2151.414(D) factors and we are unable to conclude that the court abused its discretion when it evaluated the best interest factors.   The court rationally could have determined that despite the children's desire to be reunited with their parents, permanent custody ultimately would be in their best interests.

**{¶ 36}** Regarding the first best interest factor, the children's interactions and interrelationships, the evidence presented at the permanent custody hearing demonstrates that the children appear to share a bond with their parents and with each other.   The ACCS caseworker testified that the parents appeared to have appropriate interaction with the children.   The father's sister, however, recounted an incident when she heard the mother using   vulgar language when yelling at her children and heard a commotion that she interpreted to mean that the mother was striking a child's head with a hairbrush.   No other negative interactions are apparent.   Little evidence was presented regarding the children's present environments and interactions with their respective foster homes, beyond general testimony that they are thriving, are receiving appropriate care, and are attending school on a consistent basis.

---

[3] Because neither appellant raises an argument regarding the trial court's R.C. 2151.414(B)(1)(d) finding, we do not address it.

**{¶ 37}** With respect to the second best interest factor, the children's wishes, the trial court observed that the children have expressed a consistent desire to be reunified with their parents.   We recognize, however, that the guardian ad litem recommended that the court award ACCS permanent custody.

**{¶ 38}** Regarding the third best interest factor, the children's custodial history, the evidence shows that except for the period beginning October 21, 2008, the children had been in their parents' physical custody.   Thus, the children have not been in ACCS's temporary custody for a majority of their lives.   Rather, the children have lived with their parents for the majority of their lives.   ACCS may have had involvement in the family's life for a significant time period, but that appears partly due to the family's request for assistance in providing care to their disabled child, A.M.1.   We further note, however, that when the parents had physical custody of the children, they moved frequently and had great difficulty obtaining stable housing.

**{¶ 39}** With respect to the fourth best interest factor, the children's need for a legally secure permanent placement, the evidence shows that the children need a legally secure permanent placement.   The parents do not have stable housing or sustainable income and, according to the testimony, have shown no sincere motivation to obtain either.   The parents presently do not have a legally secure permanent placement for the children and have not demonstrated a likelihood that they will at any time in the future.   Thus, the children's need for a legally secure permanent placement is obvious.   Moreover, the record does not contain any evidence that the children can obtain a legally secure permanent placement without granting ACCS permanent

custody.   As we stated, the evidence ACCS presented shows that parents have failed to demonstrate that they are willing to provide a legally secure permanent placement for the children.   ACCS has worked with the family for at least four years, during which time the ACCS caseworkers found that appellants put forth no sincere efforts to obtain stable housing or employment.   Appellants may have made half-hearted attempts to find stable housing or employment, but these half-hearted efforts fall short of the commitment necessary to demonstrate a willingness to provide a legally secure permanent placement for their children.   ACCS caseworkers stated that they considered other options, such as long-term foster care or relative placement, but found neither to be a suitable option.   Thus, the evidence shows that the children need a legally secure permanent placement that cannot be achieved unless ACCS receives permanent custody.

{¶ 40} Upon consideration of the totality of the factors, and recalling that the trial court's judgment may rest upon witness demeanor and other matters that do not translate to the written record, we are unable to find that the trial court abused its discretion when it weighed these factors and determined that permanent custody would be in the children's best interests.   Even if we were to weigh the factors differently, the abuse-of-discretion standard of review does not permit us to substitute our judgment for the trial court's.   We recognize that the termination of parental rights is one of the most difficult decisions that courts encounter.   Moreover, the decision may rest upon nuances that we are unable to discern when reviewing the written record.   Thus, appellate courts must largely defer to a trial court's judgment.   In the case at bar, we

find nothing in the record to suggest that deferring to the trial court would be in error.

{¶ 41} Furthermore, to the extent that the mother argues that the trial court was obligated to follow the children's wishes, we disagree. A child's wish is but one of several factors that a court must consider when conducting a best interest analysis. A court has discretion to determine the weight to afford to each factor, and need not elevate the child's wish over any other factor. See, generally, In re Yates, Geauga App. No. 2008-G-2836, 2008-Ohio-6775, at ¶39.

{¶ 42} We additionally observe that although not an express factor under the best interest analysis, the evidence presented at the hearing demonstrates the parents' persistent lack of motivation to obtain gainful employment and to establish stable housing. ACCS has worked with the parents for at least four years, but the parents have not demonstrated a commitment to obtaining the necessary employment or housing to appropriately provide for the children. ACCS suspected that the parents have substance abuse problems, which the father's subsequent incarceration for drug possession confirmed. In July 2009, the mother was arrested for driving while under the influence and child endangering. Both parents failed to comply with all of ACCS's drug screen requests. At one point, the father admitted that he would test positive for drugs, and the mother tore up the drug screen form. Moreover, the mother failed to complete the case plan requirement to undergo counseling at Tri-County Mental Health and Counseling. Despite ACCS's repeated attempts to obtain appellants' compliance with the case plan requirements to obtain a source of income other than A.M.1's SSI payments and to obtain independent, stable housing, appellants have sadly

demonstrated a lack of commitment or an unwillingness to do so.   We recognize that the current state of the economy may make it difficult for an adult to obtain gainful employment.   In the case sub judice, however, other factors appear to be the main culprit for appellants' inability to find gainful employment.   Sadly, the record amply demonstrates the appellants' lack of commitment to obtain gainful employment. Moreover, ACCS has provided appellants with more than sufficient time to obtain employment and stable housing for the children, yet they have demonstrated an unwillingness to do so.   Their actions have not demonstrated that they are committed to providing the basic necessities for their children, let alone the special needs of A.M.1.   Although appellants may have made half-hearted attempts to find employment, housing, or to obtain education necessary for gainful employment, they have demonstrated an unwillingness to commit to any of these things.   Appellants may have found themselves in an unfortunate situation, but ACCS has provided substantial efforts and resources to assist this family, all to no avail.

{¶ 43} Moreover, we observe that at the November 10, 2008 review hearing, the trial court warned appellants that they may lose custody of their children if they could not demonstrate motivation to obtain housing or employment.   The court commented:

> "One of the most frustrating parts with [the parents] has been the fact that they're quite capable of being employed and quite capable of holding down some kind of a job that will bring some kind of income into that household besides [A.M.1's] check.   And now with the kids removed and safely in good hands I would think that they could do it in a big way and they could actually establish independent housing that they're capable of hanging onto for some period of time.   Absent that it is going to be very hard for me to dream up some idea that makes sense for this family to try to go back together as a unit regardless of whether, you know, [the father] is or isn't out in the shed smoking pot and regardless of

> whether or not [the mother] is using the right tone of voice when she, you know, disciplines or parents the kids. They're really showing me no meaningful effort toward what would be a very critical part establishing stability."

Thus, at least one year before ACCS filed the permanent custody motion, the parents knew or should have known that the trial court expected them to find stable housing and employment so as to be able to properly provide for their children. Had appellants been sincere, they would have taken the court's comment to heart and demonstrated their commitment to obtain stable housing and employment. Moreover, the ACCS caseworkers stated that they did not believe that appellants were sincerely motivated to improve their condition.

{¶ 44} Accordingly, based upon the foregoing reasons, we overrule the mother's and the father's first assignments of error.

IV

{¶ 45} In her second assignment of error, the mother asserts that the trial court erred by failing "to specifically determine that granting permanent custody to ACCS and terminating all parental rights, was the only way to achieve a legally secure placement for the children."

{¶ 46} We note, however, that the Ohio Supreme Court has explicitly rejected the mother's argument. In In re Schaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶64, the court held that a trial court does not have a duty to find that terminating parental rights is the "only way" to provide the children with a legally secure placement. The court explained:

> "[The court has no duty to] determine by clear and convincing

evidence that 'termination of appellant's parental rights was not only a necessary option, but also the only option.'   Nor did that duty include the requirement that the juvenile court find by clear and convincing evidence that no suitable relative was available for placement.   The statute requires a weighing of all the relevant factors, and the trial court did that in this case.   R.C. 2151.414 requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d).   The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor.   The statute does not even require the court to weigh that factor more heavily than other factors."

Id.   Based upon this rationale, we reject the mother's argument that the trial court erred by failing to determine that granting ACCS permanent custody is the "only way" to achieve a legally secure placement for the children.

**{¶ 47}** Furthermore, to the extent the mother argues that the trial court should have considered other relative placement options, we have previously held that a court need not consider relative placement before awarding a children services agency permanent custody.   See In re Keaton, Ross App. Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, at ¶61.   We stated:

"[T]he statute does not require a juvenile court to consider relative placement before granting the motion for permanent custody.   See In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11; In the Matter of Knight (Mar. 22, 2000), Lorain App. Nos. 98CA7258 and 98CA7266.   In other words, a juvenile court need not find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting the permanent custody request.   Id.   Relatives seeking the placement of the child are not afforded the same presumptive rights that a natural parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody.   See Dyal; In re Jefferson (Oct. 25, 2000), Summit App. Nos. 20092 and 20110; In re Davis (Oct. 12, 2000), Cuyahoga App. No. 77124.   Rather, a juvenile court is vested with discretion to determine what placement option is in the child's best interest.   See Dyal; Patterson; Benavides.   The child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.

> In re Adoption of Ridenour (1991), 61 Ohio St.3d 319, 324, 574 N.E.2d 1055.   Therefore, courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.   See In re Dyal, Hocking App No. 01CA11, 2001-Ohio-2383; see, also, In re Lewis, Athens App. No. 01CA20, 2001-Ohio-2618; In re Wilkenson (Oct 12, 2001), Hamilton App. No. C-010402, C-010408; In re Knight (March 22, 2000), Lorain App. Nos. 98CA72589, 98CA726698."

Id.   For similar reasons, we reject the mother's argument that the trial court should have considered the availability of a relative placement before it awarded ACCS permanent custody.

{¶ 48} Accordingly, based upon the foregoing reasons, we overrule the mother's second assignment of error.

V

{¶ 49} In his second assignment of error, the father asserts that the trial court's decision violates the equal protection clauses of the United States and Ohio Constitutions and substantive due process considerations.   In essence, the father contends that the trial court unconstitutionally based its decision to award ACCS permanent custody upon his poverty.   The father asserts that a trial court may not award custody to a children services agency based upon a parent's "abject poverty."

{¶ 50} We considered a similar argument in In re Pettiford, Ross App. No. 06CA2883, 2006-Ohio-3647 and stated:

> "The evidence shows that the mother's failure to obtain suitable housing for her children, not her poverty, was part of the reason for the court's decision.   There is a difference between being homeless because of lack of funds and being homeless because of lack of motivation.   In the instant case, the evidence suggests a lack of motivation, which helps demonstrate an unwillingness or lack of commitment to providing an adequate home for her children.   See, generally, In re Lewis, Athens App.

No. 03CA12, 2003-Ohio-5262."

Id. at ¶56.

{¶ 51} The same rationale applies in the case at bar. Here, the trial court's decision does not place undue emphasis on the parents' poverty in and of itself as a reason to terminate their parental rights. Rather, the court notes that the parents have failed to demonstrate a commitment to improve their financial picture so as to provide stable housing and income for their children's basic necessities. The trial court's decision does not imply that the parents' poverty is the only, or even the primary reason to justify the permanent custody award. Instead, the court looked to the children's best interests, which we discussed above. Thus, contrary to the father's suggestion, we believe that the trial court did not rely solely upon his "economic status." Rather, many factors entered into the court's decision. See, generally, In re R.C., Wyandot App. Nos. 16-9-11, 16-9-12, and 16-9-13, 2010-Ohio-3800, at ¶28 (noting that "insurmountable poverty" alone may not justify permanent termination of parental rights, but when the parent demonstrates a "lack of desire, enthusiasm and motivation" to improve the parent's financial picture, then permanent termination is justified); In re Shifflet, Athens App. No. 06CA13, 2006-Ohio-3576, at ¶40 (observing that court did not rely solely upon parent's poverty but considered all relevant factors and also noted parent's lack of commitment to child); In re Link, Athens App. Nos. 05CA23, 05CA24, and 05CA25, 2006-Ohio-529. As the court explained in In re K., Cuyahoga App. No. 83410, 2004-Ohio-4629, at ¶40:

> "Poverty in and of itself is not a crime. Nor is it a basis for permanently removing children from their parents. When an

impoverished parent's actions, however, result in parental neglect, our society would be remiss if it did not intervene for the sake of the child's welfare. Appellant had more than two years to remedy the situation in which she found herself. Her children should not be penalized because she did not do so."

{¶ 52} In the case sub judice, the parents had approximately four years to obtain suitable housing and sustainable income. However, they both demonstrated a lack of commitment to obtain either. Thus, this is not a situation in which a court is penalizing parents solely due to their impoverished condition.

{¶ 53} Accordingly, based upon the foregoing reasons, we hereby overrule the father's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellants costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, P.J. & Kline, J.: Concur in Judgment & Opinion
                    For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.