[Cite as *Woodmansee v. Woodmansee*, 2025-Ohio-4685.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| CASSANDRA WOODMANSEE | : | |
| | : | C.A. No. 30446 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 DR 00742 |
| v. | : | |
| | : | (Appeal from Common Pleas Court- |
| SEAN WOODMANSEE | : | Domestic Relations) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on October 10, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, JUDGE

EPLEY, P.J., and TUCKER, J., concur.

MONICA L. WELKER, Attorney for Appellant
JENNIFER L. BROGAN, Attorney for Appellee

LEWIS, J.

{¶ 1} Appellant Sean Woodmansee appeals from a final judgment and decree of divorce of the domestic relations division of the Montgomery County Court of Common Pleas. For the following reasons, we affirm the judgment of the trial court.

I.      Facts and Course of Proceedings

{¶ 2} On October 31, 2023, Cassandra Woodmansee filed a complaint for divorce in the domestic relations division of the Montgomery County Court of Common Pleas. She alleged that she married Sean Woodmansee in April 2013 in Florida. They had one adopted child together, who was approximately 19 months old when Cassandra filed for divorce. Sean filed an answer and counterclaim in which he agreed that they had one minor child, were incompatible, and should be granted a divorce.

{¶ 3} A final evidentiary hearing ("hearing") was held in November 2024 regarding the remaining contested issues of the allocation of parental rights and responsibilities and spousal support. Sean sought shared parenting of their adopted child while Cassandra sought sole legal custody of the child. Cassandra and Sean were the only witnesses who testified at the hearing.

{¶ 4} Cassandra testified that the parties were married on April 27, 2013, and separated in 2024. She had been the primary parent of their adopted minor child since a few days after his birth in March 2022. Cassandra had tended to her child's daily needs and organized his activities and appointments. She had a flexible work schedule that allowed her

2

to be the primary caregiver. Cassandra believed it was in the best interest of the child that she remained the primary caregiver and residential parent. She did not believe sharing equal parenting time with Sean was in the child's best interest because of Sean's drinking, mood swings, and an incident where Sean had left his medication in the sink. Cassandra expressed concerns about Sean's mental health. Sean had been diagnosed with severe depression and anxiety. Cassandra was especially concerned about Sean's mood swings and temper.

{¶ 5} Cassandra emphasized Sean's lack of collaboration in communication, his disrespectful comments about her in front of their child, and his disinterest in attending extracurricular activities or taking advantage of his scheduled parenting time as reasons why she should receive legal custody of their child. Cassandra presented summaries she prepared showing Sean's failure to take advantage of his allotted parenting time during the divorce proceedings. She explained that she had modified the parenting time schedule for Sean and offered him alternate days to have the child when Sean missed days. Cassandra believed Sean had failed to provide sufficient notice when he was unable to take the child during the court-ordered visitation schedule. She preferred that Sean provide two weeks notice of any change that he proposed to their parenting time schedule. Cassandra noted that Sean had shown no interest in seeing their child the week prior to or the week of the hearing.

{¶ 6} Cassandra submitted audio evidence of Sean berating her in front of their child. She also submitted evidence of rude comments from Sean directed at her in emails. Cassandra asked the court to order that future communications between the parents be made through a communication app. Just over a year before the hearing, Cassandra had been fearful of Sean because she believed he had been tracking her through her phone and

3

watching her through their Ring cameras at home. Cassandra also believed Sean had intentionally turned off the water and heat in the house and had unhooked the refrigerator as part of his toxic behavior toward her.

{¶ 7} Cassandra's sister and parents lived relatively close to her. However, Cassandra did not have a good relationship with her parents and did not want them to be a part of her child's life. She did not believe her child would benefit from knowing his maternal grandparents. Cassandra had a close friend who was a teacher and available to babysit the child, especially during the summer months. Cassandra stated that Sean did not have any family who lived close to him.

{¶ 8} Cassandra also testified about her income and her job. Prior to the divorce proceeding, she made approximately $82,000 per year as a manager at a health care provider. She then took a new job at a professional services corporation where she made well over $100,000 per year. However, the corporation subsequently made cuts in its workforce and terminated Cassandra's employment. Cassandra had no role in her employment being terminated. She received unemployment benefits for approximately two months. Cassandra applied for several new jobs and received an offer from her prior employer, the health care provider. In 2024, she accepted her current job as an outcomes manager with the health care provider, earning approximately $82,000-$83,000 per year.

{¶ 9} During Sean's testimony, he claimed that much of Cassandra's testimony was false. Although Sean admitted to having some arguments with Cassandra, he denied that he had tampered with the water or the refrigerator in the house or that he had tracked Cassandra's phone. Sean acknowledged berating Cassandra in the audio recording admitted at the hearing. But he claimed that he had been extremely hurt and shocked at the time because Cassandra had filed for divorce shortly after they had adopted their child. Sean

4

stated that he was ashamed and embarrassed about his statements in the audio recording. He admitted that he could communicate better with Cassandra but maintained that it was difficult because according to him, she was angry, rude, and condescending. Sean stated that Cassandra yelled at him as much as he yelled at her, but his language was a little worse than hers at times. He characterized Cassandra as "sneaky" and stated that he feared she began making accusations against him only to set him up for a domestic violence charge. He had purchased Ring cameras for their residence so he could obtain evidence to defend himself if Cassandra accused him of domestic violence.

{¶ 10} Sean admitted that he had missed some days of their agreed parenting time schedule but blamed his work schedule for those absences. Sean also conceded that on occasion, he had not followed the court order's instructions regarding notification of Cassandra of when he could exercise his parenting time. However, he noted that Cassandra knew his work schedule and should not have been surprised to find out that he could not watch their child on days that he worked. Sean stated that he wanted shared parenting and suggested a plan that worked around his rotating schedule as a firefighter paramedic for the City of Fairborn. He explained that he had experience coparenting his two daughters from a previous marriage. His daughters lived in South Carolina but had a good relationship with Sean's son. Sean also pointed out that he had shared with Cassandra all the daily duties of caring for their son until she moved out and took control of everything.

{¶ 11} Sean expressed concerns about Cassandra's parenting skills. He stated that Cassandra initially did not want their child to receive recommended vaccines. She eventually agreed to the recommended vaccines but not the flu shot or the Covid-19 vaccine. Sean did not understand why Cassandra had been taking their child to a chiropractor and thought it was unnecessary. Sean had a more extensive medical background than Cassandra and

5

believed he should play a bigger role in making the medical decisions for their child. Sean agreed that Cassandra loved their child and had his best interests at heart.

{¶ 12} Sean testified that he had a wonderful relationship with their child. Sean taught him how to ride a bike, took him to parks, and worked with him on learning his words and colors. Sean characterized their son as becoming very verbal. Sean agreed that he did not speak much about Cassandra with their son. But according to Sean, he had not discouraged a relationship between Cassandra and their son.

{¶ 13} Sean previously was diagnosed with depression and anxiety. He took medication to assist him. Sean noted that about seven or eight years ago, he occasionally forgot to take his medication. He denied that he had ever left medication in the sink.

{¶ 14} Sean testified regarding his income as a firefighter and paramedic. He agreed that he had not paid any of their son's medical bills since Cassandra moved out but explained that she had not submitted any of those bills to him. Sean also testified that Cassandra's prior employment with the professional services corporation was very stressful for her.

{¶ 15} On January 2, 2025, the trial court issued its decision finding, in relevant part, that it was in the best interest of the minor child to be in the legal custody of Cassandra. The court further found that neither party was underemployed and that Sean should pay Cassandra $200.00 per month in spousal support for 46 months.

{¶ 16} On March 12, 2025, the trial court issued its final judgment and decree of divorce, which fully incorporated its January 2 decision. The court designated Cassandra as the residential parent and legal custodian of the minor child. The court also stated that Cassandra "is the final decision-maker for the minor child, but only after meaningful discussion with [Sean]. [Sean] should be consulted when setting all doctor's appointments and included in all major medical decisions." The court set forth the property division, the

6

amount of child support to be paid by Sean, and the parenting time to which Sean was entitled. Finally, the court ordered Sean to pay $200.00 per month in spousal support to Cassandra for a total of 46 months. Sean filed a timely notice of appeal.

## II.      The Trial Court Did Not Abuse Its Discretion When It Granted Legal Custody of the Minor Child to Cassandra

{¶ 17} The first two assignments of error are interrelated, so we address them together. These assignments of error state:

THE TRIAL COURT ERRED IN NAMING APPELLEE THE RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE PARTIES' MINOR CHILD WITHOUT ADDRESSING THE FACTORS FOUND WITHIN R.C. 3109.04(F)(1).

THE TRIAL COURT ERRED IN NOT GRANTING APPELLANT'S REQUEST FOR SHARED PARENTING WITHOUT ADDRESSING R.C. 3109.04(F)(2).

{¶ 18} "Trial courts have substantial discretion in making custody decisions, and we review a court's decision for an abuse of discretion." *In re M.J.S.*, 2022-Ohio-1114, ¶ 7 (2d Dist.), citing *In re M.W.*, 2016-Ohio-4891, ¶ 58 (2d Dist.). "'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

7

{¶ 19} When allocating parental rights and responsibilities, a trial court must consider the non-exclusive factors found in R.C. 3109.04(F)(1). These factors include: (a) the wishes of the child's parents; (b) the wishes and concerns of the child, as expressed to the court; (c) the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) the child's adjustment to the child's home, school, and community; (e) the mental and physical health of all persons involved in the situation; (f) the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) whether either parent has failed to make all child support payments; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with the court's order; and (j) whether either parent has established a residence, or is planning to establish a residence, outside this state. R.C. 3109.04(F)(1). A court has discretion to determine the weight to afford to each factor and is not required to elevate one particular factor over any other factor. *See In re A.M.1*, 2010-Ohio-5837, ¶ 41 (4th Dist.), citing *In re Yates*, 2008-Ohio-6775, ¶ 39 (11th Dist.).

{¶ 20} When determining whether shared parenting is in the best interest of a child, a trial court must consider the factors in R.C. 3109.04(F)(1) as well as the following factors set forth in R.C. 3109.04(F)(2): (a) the ability of the parents to cooperate and make decisions jointly with respect to the child; (b) the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; (c) any history of, or potential for, child abuse, spousal abuse, other domestic violence, or parental kidnapping

8

by either parent; (d) the geographic proximity of the parents to each other as it relates to the practical considerations of shared parenting; and (e) the recommendation of the guardian ad litem ("GAL") of the child.

{¶ 21} In its January 2, 2025 decision, the trial court began its analysis of the allocation of parental rights and responsibilities by stating that it had considered all the factors contained in R.C. 3109.04(F)(1) to determine what was in the child's best interest. Over several pages of the decision, the trial court highlighted the key evidence relevant to the best interest analysis. The trial court concluded:

> The Court finds Mother's testimony regarding Father's vitriol towards her important enough that it could prevent him from putting his son's needs first. Additionally, it appears to the Court that she has been able to set aside father's bad behavior with her, and still encourage a relationship with their son. She has been the primary caregiver for [the child], which appears to be working well. However, the Court also believes that Mother has been unreasonable with expectations over parenting time constraints. From evidence of the child being bonded with both parents, the Court is hopeful that these parents will both be able to enhance their co-parenting for [the child's] sake.
>
> Based on all of the testimony and evidence, and weighing the statutory factors, the Court determines it is in [the child's] best interest to be in the legal custody of his mother. . . .

Decision (Jan. 2, 2025), p. 12-13.

{¶ 22} Sean argues that the trial court "mostly ignored" the factors set forth in R.C. 3109.04(F)(1) and that the five factors listed in R.C. 3109.04(F)(2) "undoubtedly point

to Shared Parenting being called for in this matter." Appellant's Amended Brief, p. 5, 10. We disagree.

{¶ 23} Based on our review of the evidence in the record and the trial court's decision, we conclude that the trial court considered and weighed all the factors contained in R.C. 3109.04(F)(1) and (2). The fact that the trial court did not explicitly state that it considered the factors in R.C. 3109.04(F)(2) is an insufficient basis on which to conclude that the trial court did not consider them. The trial court identified and analyzed evidence relevant to the factors contained in R.C. 3109.04(F)(2) and stated that it had reviewed the GAL's report, which specifically discussed all the factors contained in R.C. 3109.04(F)(1) and (2).

{¶ 24} Although three of the five factors of R.C. 3109.04(F)(2) did not weigh strongly in favor of either party, the remaining two statutory factors weighed strongly in favor of rejecting Sean's motion for shared parenting and granting legal custody to Cassandra. First, the parties' testimony and the exhibits showed that Sean struggled with encouraging the sharing of love, affection, and contact between the child and Cassandra. R.C. 3109.04(F)(2)(b). Sean admitted this in his own testimony, and the audio recordings provided a clear example of Sean's inappropriate behavior. In contrast, Cassandra testified that she encouraged the sharing of love, affection, and contact between Sean and their child.

{¶ 25} Second, the recommendation of the GAL supported the trial court's denial of the motion for shared parenting and the grant of legal custody to Cassandra. R.C. 3109.04(F)(2)(e). The GAL addressed each of the factors contained in R.C. 3109.04(F)(1) and (2). The GAL highlighted the following two factors that weighed in favor of granting legal custody to Cassandra: (1) Cassandra was the parent more likely to honor and facilitate court-approved parenting time rights or visitation; and (2) "Cassandra

10

encouraged the minor child to share love, affection, and contact with Sean while Sean called Cassandra a fraud, liar, piece of shit, and lazy in front of the minor child[.]" GAL Report, p. 10.

{¶ 26} Similarly, though analysis of the factors under R.C. 3109.04(F)(1) revealed most did not weigh strongly in favor of either party, the trial court specifically credited Cassandra's testimony regarding Sean's "vitriol towards her" and found that fact important enough that "it could prevent him from putting his son's needs first." Decision, p. 12. The trial court emphasized that Cassandra had been able to set aside Sean's bad behavior with her and encourage a relationship between Sean and their son. *Id.* at 13. Sean, though, had not been able to reciprocate that behavior. Rather, Sean conceded that he had spoken poorly about Cassandra in front of their son and had not spoken much to their son about Cassandra otherwise. He seemed to struggle with the idea of why he would speak about Cassandra at all in front of their son. The most Sean was able to muster at the hearing was a tepid statement that he had not discouraged a relationship between Cassandra and their son.

{¶ 27} Based on our review of the record before us, we cannot conclude that the trial court's decision to grant legal custody to Cassandra and to overrule Sean's motion for shared parenting was unreasonable, arbitrary, or unconscionable. Therefore, Sean's first two assignments of error are overruled.

III.    **Sean Failed to Carry His Burden of Proving Cassandra Was Voluntarily Underemployed**

{¶ 28} Sean's third assignment of error states:

THE TRIAL COURT ERRED IN NOT CONSIDERING MOTHER'S HIGHER INCOME AT THE TIME SHE FILED FOR DIVORCE.

{¶ 29} "In divorce . . . proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(B). In determining the amount and duration of spousal support, the court shall consider all the factors in R.C. 3105.18(C)(1)(a)-(n), including the income of the parties and the relative earning abilities of the parties. "Because R.C. 3105.18(C) permits inquiry into a party's earning potential, Ohio courts often impute income to parties who are voluntarily underemployed or otherwise not working up to their full earning potential." *Miller v. Miller*, 1994 WL 730560, *4 (2d Dist. Dec. 28, 1994).

{¶ 30} Under R.C. 3119.01(C)(10), income is defined as either of the following: "(a) For a parent who is employed to full capacity, the gross income of the parent; (b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent." R.C. 3119.01(C)(18) defines the potential income of a voluntarily underemployed parent as the imputed income that the parent would have earned if fully employed. The statute lists 11 criteria to be used to decide the amount of income to impute. R.C. 3119.01(C)(18)(a)(i)-(xi). The burden of proof lies on the party seeking to impute income. *Ketchum v. Coleman*, 2014-Ohio-858, ¶ 17 (2d Dist.).

{¶ 31} R.C. 3119.01(C)(18)'s "plain language requires the domestic-relations court to make two specific determinations when calculating potential income." *Ayers v. Ayers*, 2024-Ohio-1833, ¶ 14. First, the court must determine whether a parent's underemployment was voluntary. *Id.* If the underemployment was not voluntary, the analysis ends, and no additional income is imputed to the parent. However, if the court determines the underemployment was voluntary, the court must then determine what the parent would have earned if fully employed, using the criteria enumerated in R.C. 3119.01(C)(18)(a)(i)-(xi). *Ayers* at ¶ 14.

12

"[T]he substance of the court's determination of a parent's voluntary [underemployment], as well as the substance of its decision to impute potential income to that parent, are factual questions that may not be disturbed on appeal absent an abuse of discretion. *Id.* at ¶ 21, citing *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993).

{¶ 32} The trial court found that neither party was "choosing to be underemployed." Sean argues that the trial court should have imputed income to Cassandra based on the salary she received from a previous job. According to Sean, "[t]he trial court never addressed [Cassandra's] income dropping by half a few short months after she filed for divorce" and "no evidence was provided of [Cassandra's] diligent and continuous search for employment at her former income level of $160,000." Appellant's Amended Brief, p. 13-14. Sean notes that Cassandra lost her higher-paying job within a few months of filing for divorce "and almost immediately began working for half of her prior income." *Id.* at 15. Sean contends that "[n]o evidence was provided of her being laid off, or of how long or hard she looked for employment that would continue to pay her over $160,000." *Id.* Sean concludes that it was not believable for Cassandra to "coincidentally" go from making twice as much as him to half her prior income after filing for divorce and requesting child support. Sean believes "[t]his was a deliberate attempt on the part of [Cassandra] to increase her support payment from [Sean], and the trial court erred in foreclosing off this line of questioning by [Sean]." *Id.*

{¶ 33} Based on our review of the record, we conclude that the trial court did not abuse its discretion in finding that Cassandra was not voluntarily underemployed. Cassandra testified at the hearing about her income and her job. She made about $82,000 per year as a manager at a health care provider until she started a new job with a professional services corporation where she made well over $100,000 per year. Cassandra's new employer eventually made cuts in its workforce and terminated her

13

employment. She had no role in the termination of her employment. Cassandra received unemployment benefits for approximately two months. She applied for several new jobs and received an offer from her former employer. She accepted her current position as an outcomes manager in 2024 with an income of approximately $82,000-$83,000 per year.

{¶ 34} Nothing in the record indicates that Cassandra was involved in the termination of her employment or that she was voluntarily underemployed. Instead, Sean's entire argument is based on the faulty assumptions that Cassandra had the burden to prove she was not voluntarily underemployed and that the trial court should not have relied on her testimony. Sean failed to introduce any evidence at the hearing that Cassandra's termination from employment at the professional services corporation was a voluntary decision. Rather, he relies on speculation rooted in the coincidence of Cassandra's job loss and her divorce filing. The trial court believed Cassandra's uncontroverted testimony that she was involuntarily terminated from her employment. Because the trier of fact sees and hears the witnesses, we generally defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). Notably, Cassandra's most recent annual income was consistent with her historical annual income except for the period when she was employed by the professional services corporation. The increased income Cassandra earned during her short employment with the professional services corporation appeared to be the clear outlier in her earnings history.

{¶ 35} Finally, Sean argues that the trial court improperly foreclosed him from asking questions about Cassandra's failure to gain alternative employment with pay comparable to her prior earnings at the professional services corporation. In support, Sean cites the following exchange during his testimony at the hearing:

Q. So after the divorce was filed, what happened to [her] income?

A. She apparently lost her job.

Q. Okay. Um, what do you believe she's capable of making?

MS. BROGAN: Objection. Irrelevant.

THE COURT: He's not an expert. I'm going to sustain that.

MS. WELKER: I'm sorry?

THE COURT: Not an expert. I'm going to sustain it.

MS. WELKER: I was just wondering. Okay.

{¶ 36} Sean complains the trial court should not have prevented him from testifying to what he "believed" Cassandra was capable of earning. However, Sean had not established any foundation indicating that he had knowledge pertinent to Cassandra's maximum earning potential or the existence of any alternative, higher-earning employment available to her. Dispositive to this appeal, Sean also had not established that Cassandra was even voluntarily underemployed. The trial court had no reason to proceed to the second step of the statutory analysis and receive evidence about additional income that should have been imputed to Cassandra. The trial court did not abuse its discretion in sustaining the objection to Sean's speculative testimony about Cassandra's earning potential.

{¶ 37} The third assignment of error is overruled.

## IV. Conclusion

{¶ 38} Having overruled all of the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . .

EPLEY, P.J., and TUCKER, J., concur.

15